In re **FABRICATORS, INC.**

**FABRICATORS, INC., Plaintiff,**

v.

**TECHNICAL FABRICATORS, INC., Defendant.**

Bankruptcy No. 8507445SC.
Adv. No. 850833.

United States Bankruptcy Court,
S.D. Mississippi.

Nov. 16, 1987.

Hugh D. Keating, Gulfport, Miss., for trustee.

Richard Scruggs, Pascagoula, Miss., for debtor.

Irvin Grodsky, Mobile, Ala., for defendant.

## MEMORANDUM OPINION AND ORDER

EDWARD R. GAINES, Bankruptcy Judge.

A complaint was filed on behalf of the debtor, Fabricators, Inc., against Technical Fabricators, Inc., requesting subordination of the claims of Technical Fabricators, Inc. and transfer of its liens to the estate pursuant to 11 U.S.C. § 510(c). After considering the record and the evidence presented, and reviewing the memoranda submitted by counsel and the principles of subordination from applicable case law, the Court finds that the claims of Technical Fabricators, Inc. not already relegated to the class of general unsecured creditors, should be subordinated to the status of general unsecured creditors, and the liens of Technical Fabricators, Inc., should be transferred to the estate.

This adversary proceeding has been in litigation for two and a half years. After completion of the Chapter 11 debtor's case-in-chief, there was a substitution of counsel for the defendant, conversion to a Chapter 7 with the appointment of a trustee whose rights to proceed with the suit succeeded that of the debtor. There was also a change in the bench. The record is voluminous.

The basic issue in this proceeding is whether Technical Fabricators, Inc., by its conduct, caused injury to or gained an unfair advantage over the creditors of Fabricators, Inc., in a manner prohibited by law. The Court is of the opinion that it did.

## I.

### FINDINGS OF FACT

The Plaintiff, Fabricators, Inc. (hereinafter "Fabricators") was a Mississippi corporation engaged in the steel fabrication business. Prior to Fabricators filing its petition for relief under Chapter 11 of the Bankruptcy Code on April 8, 1985, it had two facilities. One was located on Orchard Road, Pascagoula, Mississippi, and the other was located on Eighth Street in Biloxi, Mississippi. Prior to January, 1985, Fabricators' common stock was owned by Theodore J. Millette, Thomas S. Millette, William G. Millette, and James Avinger. Each individual owned 25% of the stock.

Technical Fabricators, Inc., (hereinafter "TFI"), the Defendant, is an Alabama corporation, with its principal place of business in Mobile, Alabama. TFI was actively engaged in the fabrication business under its current management from 1971 through the first quarter of 1984. Its principal place of business was at Building 16, Brookley Industrial Complex, Mobile, Alabama. TFI's sole stockholder, director, President, and Chief Executive Officer during all periods of time relevant to this proceeding was Marcus Wayne Williams (hereinafter "Williams"). Prior to the events giving rise to this adversary proceeding, Fabricators and TFI had no business connection with one another.

During the months prior to February 1, 1985, Fabricators had been actively engaged in business, soliciting and obtaining new contracts and operating its production facilities at capacity. As of February 1, 1985, Fabricators had numerous contracts for the fabrication of steel for different customers, but it was experiencing difficulties in the timely performance and completion of its contractual obligations. One of Fabricators' major problems was a severe shortage in available cash to pay suppliers and employees while fabrication was being completed, but before the customer was liable for payment. In addition to this cash flow problem, Fabricators had insufficient physical capacity and equipment in its two plants and insufficient management capability to complete all of the work it had under contract.

By early 1985, Fabricators and its individual stockholders had completely exhausted their lines of institutional and trade credit. Fabricators' financial condition had deteriorated to such an extent by the end of January, 1985, that the company had insufficient funds for its $40,000 weekly payroll.

In late December, 1984, or early January, 1985, James C. Avinger (hereinafter "Avinger"), the President of Fabricators,

contacted Williams, who was the President and sole shareholder of TFI, concerning a possible merger, joint venture, or outright sale of Fabricators to TFI. Avinger had worked for Williams and TFI in past years in the steel fabrication business. Williams had been generally familiar with Fabricators from his 15 years experience in the fabricating business, and from his acquaintance with Avinger and other key Fabricators' employees who had previously worked for Williams at TFI.

Prior to the end of the first quarter of 1984, TFI had enjoyed financial success in the steel fabrication business. After the first quarter of 1984, TFI voluntarily ceased new production due to a decision by its management to refrain from seeking new business as a result of the general downturn in the steel fabrication industry. However, after April, 1984, TFI retained its large production facility equipped with modern, high-technology equipment, subject to payment of its monthly rent to Teledyne Continental, its note secured by its equipment to Chase Commercial Corporation (hereinafter "Chase"), utilities and miscellaneous other expenses.

Following the initial inquiry by Avinger, discussions and negotiations were held between Williams in behalf of TFI and Avinger, Tom Millette, Bill Millette and Ted Millette of Fabricators concerning the problems being encountered by Fabricators. In each of these discussions, Avinger and Tom Millette described Fabricators' financial problem as a "cash crunch" problem.

Avinger provided Williams with a hand written cash flow projection that showed a profit margin on Fabricators' contracts in process of approximately $2 million. Avinger told Williams that Fabricators had good prospects for acquiring approximately $9 million in further contracts. Fabricators' directors had, in addition, caused a booklet of information concerning Fabricators to be prepared prior to the end of January, 1985, which described the structure of Fabricators and provided an itemized listing of all assets of Fabricators and its affiliates.

Williams was advised by Avinger and the Millettes that Fabricators' credit lines were "jammed"; that bank credit was exhausted; that Fabricators could not meet its payroll and payroll tax obligations; and that Fabricators' plant was inadequate for the timely performance of the contracts in process.

Williams was also told that the accounting records of Fabricators had not been posted currently, but that when financial statements were prepared, they would show Fabricators as having a positive net worth as of November 30, 1984 and would reflect that Fabricators had a net profit from operations for the months of December, 1984, and January, 1985, of at least $100,000.00; that the value of the equipment and inventory owned by Fabricators was approximately $3.5 million; and that the sum of $173,000.00 would pay all existing trade payables exclusive of any amounts owed to companies owned by the shareholders.

No current Fabricators' financial statements were available to either Fabricators or TFI because of problems resulting from the computerization of Fabricators' books. Williams was not shown, and *did not request*, Fabricators' most recent tax return. Fabricators' last federal income tax return was for the period ending November 30, 1983, and reflected a loss of $612,000 and retained earnings of <$1,085,949>. For at least two years pre-petition, Fabricators had lost substantial money from its operations.

After reviewing the projections provided to him by Fabricators, Williams confirmed that Fabricators' plant capacity was inadequate to perform timely the contracts that it had booked or begun.

In late January, 1985, Williams and the shareholders of Fabricators came to an agreement for TFI to purchase all of the shares of Fabricators. In exchange, the shareholders of Fabricators were to receive a total of twenty-five percent (25%) of the shares in TFI. The stock exchange agreement was reduced to writing by TFI's attorney, and signed by the parties in his offices in Mobile on February 2, 1985. The

agreement provided that TFI's obligation to close the sale was conditioned upon TFI's review of the books and records of Fabricators and TFI's approval of the financial condition of Fabricators within thirty (30) days of the execution of the agreement.

Incident to the stock exchange agreement, TFI agreed to lend Fabricators up to $500,000 to finance the completion of the contracts in process. It was also agreed that Williams would assume immediate control of the operations of Fabricators, and that certain of Fabricators' contracts would be moved to TFI's plant in Mobile. During the negotiations, Williams suggested that Fabricators seek "asset-based" financing including accounts receivable financing in order to meet its short term cash needs. Williams concluded that Fabricators would have "collapsed like a house of cards" had TFI not commenced advancing money in early February, 1985.

On February 4, 1985, to secure TFI advances to Fabricators, Fabricators gave TFI a security interest in, among other property, its machinery, equipment, accounts receivable and contracts in process. Fabricators had numerous unpaid creditors at this time.

In order to give TFI a first lien on the equipment, Fabricators obtained a release of an existing lien from Merchants and Marine Bank.

A financing statement identifying Fabricators as the Debtor and TFI as the creditor and further describing the collateral was filed with the Chancery Clerk in Jackson County, Mississippi on February 19, 1985, Chancery Clerk of Harrison County, Mississippi on February 19, 1985, and the Secretary of State of Mississippi on February 18, 1985.

Pursuant to TFI's commitment in the Security Agreement, TFI did on February 4, 1985, advance Fabricators the sum of $40,000.00, and did on February 5, 1985, advance Fabricators an additional $10,-000.00. In addition to the $40,000.00 on February 4, 1985, and the $10,000.00 on February 5, 1985, TFI advanced Fabrica-

tors the sum of $44,000.00 prior to February 10, 1985.

On February 10, 1985, in response to the requests of Fabricators' shareholders made during the week of February 4 through 8, 1985, Williams renegotiated some of the terms of the February 2, 1985 Agreement. The February 2, 1985 Agreement was replaced by a new agreement dated February 10, 1985, executed by all of the parties (hereinafter "February 10 Agreement"). Significantly, the February 10 Agreement eliminated TFI's previous right to refuse to purchase Fabricators' stock if TFI did not approve Fabricators' financial condition. Instead, a specific closing date of 45 days from the execution of the February 10 Agreement was substituted.

At the meeting on February 10, 1985, Williams was elected Executive Vice–President of Fabricators. Prior to that date, he had not been an officer of Fabricators, but he did exercise control over the debtor.

After the February 10, 1985 Agreement, Williams devoted his efforts and time toward the management and organization of Fabricators until March 24, 1985. Williams never received any compensation from Fabricators for his work in behalf of Fabricators. Williams reorganized Fabricators' operations, which included the reassigning of Avinger to sales, the assumption of financial control, dealing with creditors, and establishment of pay scales and vacation policy for Fabricators' employees. Williams held himself out to creditors and others as the "CEO" of Fabricators.

During the period February 11, 1985 through March 9, 1985, Fabricators operated at full production using TFI's facility in Mobile, Alabama and Fabricators' facility in Pascagoula, Mississippi. Fabricators' contracts in process with Nicholson Engineered Systems and others, together with most of its workforce, were moved into TFI's plant in Mobile, Alabama. During that period of time, Williams was in charge of operations and Avinger was in charge of sales. No new sales were made and none of the new, but unsigned contracts, which had been discussed before the February 2 Agreement, were signed. Pursuant to its

commitment, TFI advanced Fabricators an additional $135,000.00 on February 18, 1985 and an additional $40,000.00 on February 22, 1985.

On or about February 13, 1985, TFI ceased having any employees for payroll purposes. All of TFI's employees became employees of Fabricators. Williams continued as TFI's sole officer and director thereafter. From February 13, 1985 through late March, 1985, the combined companies' business affairs were managed from the same office by the same employees.

Although Avinger held the title of President of Fabricators, Williams was in fact the Chief Executive Officer both of TFI and Fabricators. Williams directed the day to day operations of the combined companies, including among other things, procurement of materials and supplies, and determining which creditors were paid and in what amount.

On or shortly after February 2, 1985, Williams was given access to Fabricators' books, and worked with Fabricators' staff and outside accountants to prepare financial data for the purpose of obtaining institutional "asset-based" financing. Williams also learned of an ongoing IRS audit of Fabricators, and was present in early February, 1985, while the audit was actually in progress. By February 19, 1985, Williams determined from the financial records of Fabricators that the company would probably be unable to secure asset-based lending.

After executing the February 2 Agreement, Williams contacted Chase and requested Chase to evaluate Fabricators for an asset-based loan. Chase conducted its own audit and examination of the financial information available. On or about February 27, 1985, Chase advised Fabricators that it would not extend an asset-based loan to Fabricators.

At the time Chase's decision was made known to Williams, Fabricators' accounting firm, Boutwell and Company, had not completed its audit. Boutwell and Company attempted to obtain the necessary information to provide audited financial statements as requested during February, 1985. On March 7, 1985, Boutwell and Company sent Williams preliminary drafts of those statements which reflected that Fabricators had lost more than $1.2 million for the fiscal year ending November 30, 1984, and had lost an additional $169,000.00 for the months of December, 1984, and January, 1985.

On March 9, 1985, Williams called a meeting. It was attended by Avinger, the Millettes, and Dan McMullen, Fabricators' outside accountant. Williams announced that he did not intend to consummate the stock exchange agreement because he believed Fabricators to be in worse shape than he initially thought. However, Williams did not disengage himself from Fabricators after this meeting.

At the time of the March 9, 1985 meeting, Fabricators was producing two or more of its major contracts at the Mobile facility. TFI made no demands for Fabricators to remove its ongoing operation from TFI's facility.

During the period of March 9, 1985, through March 24, 1985, Williams continued to manage the Fabricators operation. Fabricators continued to produce fabricated steel in accordance with its contracts. TFI advanced to Fabricators an additional $100,000.00 on March 14, 1985, pursuant to TFI's commitment. The shareholders of Fabricators considered various options for securing different assistance for future operations including finding another purchaser. No purchaser was found. TFI proposed to Fabricators' shareholders a modification of the February 10 Agreement. The modification was not accepted.

Subsequent to the March 9, 1985 meeting and on or about March 19, 1985, Williams represented to the First National Bank of Mobile that he was the Chief Executive Officer of Fabricators in a corporate resolution authorizing the opening of an account. A checking account was opened with the bank for the purpose of depositing contract proceeds beyond the reach of Mississippi bank creditors. This resolution was *not* authorized by the Board of Directors of Fabricators.

A creditor, Everett B. Greer, with Greer and Sons, Inc., was told in early February, 1985, that he would have to speak with Williams about his firm's account since Williams was handling the accounts payable. Greer and Sons, Inc., decided to continue an open account with Fabricators based on Williams' representations to Mr. Greer's son that the money would come in "like clock work".

In December, 1984, Harmon Cox, Jr., credit manager with Jeffreys Steel Company, had been contacted by Avinger in an attempt to have Jeffreys Steel Company provide new credit in order to assist Fabricators with some large jobs. Jeffreys Steel Company declined to do so. Jeffreys Steel Company in December, 1984, had Fabricators on a C.O.D. basis. Cox and Williams had a meeting wherein Williams represented that on February 17, 1985, he [Williams] had signed all the papers and was now Chief Executive Officer of Fabricators and had controlling interest in Fabricators. Based on these representations and after payment of $19,000 that was owed Jeffreys, a new line of credit was extended to Fabricators. After February 19, 1985, $60,464.94 was advanced by Jeffreys Steel Company on this line of credit. Cox was told by Williams to contact him about money since he was in control of the money.

Early in February, 1985, Daniel J. Campbell of Central Marine Services of New Orleans contacted Fabricators about his company's outstanding bill. He was placed in contact with Williams who told Campbell that he was Fabricators' CEO. Campbell was informed that checks could not be authorized without the consent of Williams. Central Marine was paid after February 10, 1985.

On March 24, 1985, the shareholders of Fabricators and TFI entered into a Release Agreement. The Release Agreement contained numerous provisions, but generally provided that the proposed acquisition by TFI was cancelled; that Fabricators was to pay TFI the $396,000.00 advanced to Fabricators by executing a promissory note calling for repayment in June and July, 1985;

that Fabricators was to be allowed to continue to rent TFI's facility and equipment for a weekly rental of $11,000.00; and that Fabricators was required to pay all payables charged to TFI for materials, services, and supplies used by Fabricators.

Upon execution of the Release Agreement, Williams exercised no further management responsibilities as an officer of Fabricators, although no written resignation by Williams was ever required or given. After the Release Agreement, Faricators continued to produce steel for its contracts at the Mobile facility until after the date of the filing of its Chapter 11 proceeding.

During the first week of April, 1985, TFI threatened to prevent shipment of steel fabricated for the Nicholson contract at TFI's Mobile facility unless Fabricators agreed to pay the proceeds of the contract to TFI. TFI wanted to use those proceeds to obtain TFI's release from certain trade debts to O'Neal Steel Corporation. TFI's threats to the Nicholson contract and other work still in TFI's facility precipitated Fabricators' Chapter 11 filing on April 8, 1985.

Fabricators filed this adversary seeking to subordinate all claims of TFI on April 9, 1985.

On January 27, 1986, Fabricators' Chapter 11 proceeding was converted to a Chapter 7 proceeding and on January 27, 1986, Plaintiff, H.S. Stanley, Jr., was appointed Trustee of the estate.

During the time that Fabricators conducted business from TFI's facility in Mobile, Alabama, materials were purchased from various suppliers for use by Fabricators based upon TFI's credit line. As a result of Fabricators' failure to pay for those materials, TFI was placed into an involuntary Chapter 7 proceeding in the Southern District of Alabama by order dated July 15, 1986. Each of the petitioning creditors in the TFI involuntary proceeding was a creditor whose claim was based upon sums owed for materials or services provided to Fabricators but billed to TFI. Within days after the order granting relief, TFI

converted the involuntary Chapter 7 proceeding to a Chapter 11 proceeding.

At the time of the trial of this adversary, TFI was the Debtor–in–Possession with limited powers in its Chapter 11 proceeding pending in the U.S. Bankruptcy Court for the Southern District of Alabama. TFI was authorized by an order of the U.S. Bankruptcy Court for the Southern District of Alabama to litigate the matter before this Court.

TFI has filed three separate proofs of claim and a request for payment of administrative expenses in this proceeding. The parties stipulated at the trial of this adversary proceeding that the amount and allowability of those claims were reserved to a later date.

Claim Number 7 was filed by TFI on April 26, 1985, as a secured claim for $369,000.00 plus interest and costs. The balance alleged by TFI to be owed on Claim 7 is $369,000.00 principal, plus $129,150.00 interest through September 24, 1987, plus approximately $205,547.80 in attorney's fees and costs.

Claim Number 6 was filed by TFI for $150,000.00 to $200,000.00, representing monies allegedly owed by Fabricators to TFI for debts incurred by TFI to creditors of Fabricators for materials or services provided by the suppliers to Fabricators but billed to TFI. The testimony in this case established that creditors in TFI's Chapter 11 with allowed claims of $160,450.00 are within this category. Claim Number 6 was filed as an unsecured claim.

Claim Number 56 was filed by TFI on October 2, 1985, as an unsecured claim in the amount of $75,000.00.

TFI filed a request for payment of administrative expenses in the amount of $406,566.38. A portion of the expenses claimed in this request are duplicative of the amounts claimed in TFI's Claims numbered 7 and 56. Subsequent to the hearing in this adversary, TFI has advised the Court that the approximate amount which it seeks under its request for payment of administrative expenses is $218,335.00.

As a result of Fabricators' agreement with TFI regarding rental payment by Fabricators to TFI, Fabricators paid TFI $50,000.00 by check dated March 6, 1985 and an additional $38,000.00 by check dated March 27, 1985. A $3,228.00 payment by Fabricators to TFI on March 5, 1985 was in payment of the interest which had accrued on monies advanced during the period February 4, 1985 through March 1, 1985. The payment was made while Williams was an insider of Fabricators.

Having detailed this Court's findings of fact, it is appropriate to set forth its conclusions of law.

## II.

### CONCLUSIONS OF LAW

■ The doctrine of equitable subordination may be employed by a bankruptcy court to balance the equities among claims of conflicting creditors to see that injustice or unfairness is not done in the administration of a bankruptcy estate. *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *Taylor v. Standard Gas and Electric Co.*, 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669 (1939). The right of the bankruptcy court to order equitable subordination of claims has been codified in 11 U.S.C. Section 510(c) which provides that:

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

The use of the term "principles of equitable subordination" in Section 510(c) as a standard was intended to mean that the Courts were to follow existing case law and continue to develop the principles of the doctrine of equitable subordination on a

case by case basis. 124 Cong.Rec. H 11095 (Sept. 28, 1978); S 17412 (Oct. 6, 1978).

■ The Trustee must prove three separate elements in order to prevail in an equitable subordination case:

(1) That the claimant engaged in some type of inequitable conduct;

(2) That the inequitable conduct of the claimant resulted in injury to the creditors of the Debtor or conferred an unfair advantage on the claimant; and

(3) The equitable subordination of the claimant's claim is not inconsistent with the provisions of the Bankruptcy Code.

*In re Mobile Steel Company,* 563 F.2d 692 (5th Cir.1977); *In re Multiponics, Inc.,* 622 F.2d 709 (5th Cir.1980).

■ A determination of whether the claimant was an insider at the time of the alleged inequitable conduct is a first step in examining the inequity of the claimant's conduct, because the conduct of a fiduciary is subject to special scrutiny by the Court and a higher degree of fidelity than the conduct of an unrelated third party. *In re Mobile Steel, supra; In re Multiponics, Inc.,* 622 F.2d 709 (5th Cir., 1980).

Section 101(30) of Title 11 defines an insider as follows:

(30) "insider" includes—

(B) if the debtor is a corporation—

(i) director of the debtor;

(ii) officer of the debtor;

(iii) person in control of the debtor;

(iv) partnership in which the debtor is a general partner;

(v) general partner of the debtor; or

(vi) relative of a general partner, director officer, or person in control of the debtor;

■ It is conceded by TFI that it was an insider of Fabricators during the period beginning on the afternoon of February 10, 1985 and terminating immediately prior to the meeting of March 24, 1985. It is argued, however, that TFI was not an insider during the period between February 2 and February 10, 1985, when approximately $94,000.00 was advanced by TFI to Fabricators. This argument is not well taken. TFI exercised control over the debtor during that period, and the monies were advanced on the basis of a merger agreement wherein TFI became an insider within the contemplation of Section 101.

TFI and Fabricators became affiliates and insiders no later than February 2, 1985, by virtue of their written agreement for TFI to acquire all of the shares in Fabricators, and the two companies merging of their affairs shortly thereafter under Williams' direction and control. TFI and Fabricators constructively merged their affairs following the February 2, 1985, stock exchange agreement.

■ Finding TFI to be an insider prior to February 10, is not required to subordinate its secured claim because the security interest was not perfected until at least February 18, when TFI was admittedly an insider.

As pointed out by the Fifth Circuit:

A claim arising from the dealings between a debtor and its fiduciaries is to be rigorously scrutinized by the courts, but the mere fact of the fiduciary relationship is insufficient to warrant subordination. *See, e.g., Missionary Baptist,* 712 F.2d at 212 (citing *Mobile Steel* and *Multiponics.)* "Upon the trustee's submission of sufficient evidence to overcome the prima facie showing, the claimant is obliged to prove his good faith and fairness in the dealings. It is at this juncture that the fiduciary's claim is subject to the probing light of judicial inquiry." *Missionary Baptist,* 712 F.2d at 212; *see Mobile Steel,* 563 F2d. at 701–02.

*In re Missionary Baptist Foundation of America,* 818 F.2d 1135 (1987).

With this in mind, the Court now considers the test for subordination as set forth in *Mobile Steel, supra.*

■ The case law has established guidelines for determining whether a claimant's conduct has been inequitable so as to justify subordinating its claim. Generally, a claimant's conduct will be deemed inequitable if the claim arises out of one of the following three categories of misconduct:

(1) fraud, illegality, breach of fiduciary duty;

(2) undercapitalization; or

(3) use of the debtor as a mere instrumentality or alter ego.

*Missionary Baptist Foundation of America, Inc.,* 712 F.2d 206 (5th Cir., 1983).

In determining whether an entity was undercapitalized, the Fifth Circuit provides the following standard:

[W]e think that for the purposes of determining whether claims against the bankrupt estate held by organizers or shareholders should be subordinated on the ground of undercapitalization, the amount of capitalization that is adequate is:

what reasonable prudent men with a general background knowledge of the particular type of business and its hazards would determine was reasonable capitalization in the light of any special circumstances which existed at the time of incorporation of the now defunct enterprise.

N. Lattin, The Law of Corporations §§ 15, 77 (1971); cf. H. Ballatine, Corporations 302–03 (rev. ed. 1946) (disregard of corporate entity); *see generally* E. Latty, Subsidiaries and Affiliated Corporations, 119–28 & 133–38 (1936). This general definition is helpful because it focuses on the culpability of the organizer-stockholders and pegs the assessment to more specific standards which do not involve open-ended quantitative questions. Foremost among the standards which the general statement suggests are the following.

(1) Capitalization is inadequate if, in the opinion of a skilled financial analyst, it would definitely be insufficient to support a business of the size and nature of the bankrupt in light of the circumstances existing at the time the bankrupt was capitalized;

(2) Capitalization is inadequate if, at the time when the advances were made, the bankrupt could not have borrowed a similar amount of money from an informed outside source.

*See* Rembar, Claims Against Affiliated Companies in Reorganization, 39 Colum. L.Rev. 907, 915–16 (1939)..

*In re Mobile Steel Co., supra, See also In re Multiponics, supra.*

■ The evidence in this case shows clearly that on February 2, 1985, and continuing through April 8, 1985, when Fabricators filed for bankruptcy, Fabricators was "undercapitalized" within the contemplation of *In re Multiponics, supra.* At the time of each advance by TFI to Fabricators, and specifically on February 4, 1985, when TFI acquired a lien on Fabricators' assets, Fabricators could not have borrowed a similar amount of money from an informed outside source.

The argument of TFI that it did not have knowledge of Fabricators' undercapitalization from the representations made by Fabricators' directors and stockholders is not well taken. TFI was aware of Fabricators' problems which included "cash crunch", jammed credit lines, the inability to obtain conventional loans, the inability to meet payroll and taxes, and an ongoing IRS audit. TFI had access to available accounting information. TFI never made the simple request to see the latest income tax return. The last filed tax return for Fabricators clearly reflected the negative financial condition of Fabricators.

The fact that current accounting information was not available is not a defense which TFI may now claim on the basis of misrepresentation or lack of knowledge. The absence of current accounting information was clearly another red flag by which a reasonably prudent man should have been warned as to the potential problems with the financial condition of Fabricators.

The Court finds no intentional misrepresentations on the part of the directors and stockholders of Fabricators, and further recognizes that, in consideration of Williams' experience and skill in the industry, TFI was in as good, if not a better position than Fabricators, to determine the true financial condition and viability of Fabricators.

TFI's advances to Fabricators should be treated as capital contributions because the

corporation was undercapitalized at the time such advances were made, and TFI's principal motive in advancing the money was to acquire control of Fabricators in order to realize a projected $2 million profit on contracts in process.

In addition, TFI acted inequitably and to the detriment of creditors by causing them to extend new credit, or to abstain from collection measures when TFI knew or should have known that Fabricators was in failing financial circumstances.

TFI acted inequitably and to the unfair advantage of TFI by obtaining a lien upon Fabricators' assets to secure capital contributions, the effect of which shifted the risk of loss from TFI to the creditors of Fabricators.

TFI acted inequitably by interfering with the completion of Fabricators' contract with Nicholson Engineered Systems to gain preferential payments and a release from TFI's liability to O'Neal Steel Corporation.

TFI acted inequitably by presenting a fraudulent resolution in order to open a bank account for the deposit of Fabricators' receivables beyond the reach of creditors.

The second prong of the *Mobile Steel* test requires that the inequitable conduct resulted in injury to the creditors of the debtor or conferred an unfair advantage on the claimant. The validation by this Court of TFI's lien would result in little or no distribution to the general creditors of Fabricators, and would, therefore, in light of the above findings, result in an injury to those creditors or unfair advantage for TFI.

Under the third prong of the *Mobile Steel* test, the Court finds that equitable subordination of the claims would not be inconsistent with the provisions of the Bankruptcy Code requiring fair and equitable distribution to creditors.

Based on the foregoing, the Court finds that the evidence presented by the trustee has overcome the prima facie validity of TFI's claims under Sections 501 and 502. However, the good faith efforts made by

Williams and TFI to rehabilitate Fabricators during the time of the attempted merger are pivotal in determining the extent of subordination.

*In re Missionary Baptist Foundation of America,* 818 F.2d at 1143 states as follows:

"[C]laims should be subordinated only to the extent necessary to offset the harm which the bankrupt and its creditors suffered on account of the inequitable conduct. *Id.* [*In re Mobile Steel Co.,* 563 F.2d 692, (5th Cir.1977)] at 701. In illustration, we pointed out that "if a claimant guilty of misconduct asserts two claims, each worth $10,000, and the injury he inflicted on the bankrupt or its creditors amounted to $10,000, only one of his claims should be subordinated." *Id.* This is due to the fact that the exercise of the subordination power is governed by equitable principles and equitable relief is remedial, not penal. *Id.*

Therefore, the Court finds that Technical Fabricators secured claims or administrative claims should be subordinated to a position equal to, and not below, that of general unsecured creditors and TFI's liens upon the property of Fabricators should be transferred to the estate pursuant to Section 510(c)(2) of the Bankruptcy Code.

SO ORDERED.