**FABRICATORS, INC., Plaintiff,**

v.

**TECHNICAL FABRICATORS, INC., Defendant.**

**Civ. A. No. S88–0539(G).**

United States District Court, S.D. Mississippi, S.D.

Nov. 9, 1989.

Richard Scruggs, Robert Pritchard, Pascagoula, Miss., for Fabricators, Inc.

Robert Alan Byrd, Biloxi, Miss., for O'Neil Steel Co.

C. Thomas Anderson, Ocean Springs, Miss., for Pine Belt S & L.

Hugh D. Keating, Gulfport, Miss., Trustee.

H.S. Stanley, Gulfport, Miss., Trustee.

Marcus W. Williams, President, Technical Fabricators, Inc., Irvin Grodsky, Mobile, Ala., Michael J. McElhaney, Jr., Pascagoula, Miss., for Technical Fabricators, Inc.

## OPINION

GEX, District Judge.

This cause is before this Court on appeal from the United States Bankruptcy Court, Southern District of Mississippi, Southern Division. A complaint was filed before the bankruptcy court on behalf of the debtor, Fabricators, Inc. [Fabricators] against Technical Fabricators, Inc. [TFI] requesting subordination of TFI's claims and transfer of its liens to the estate pursuant to 11 U.S.C. Section 510(c). After a trial of the adversary action, the bankruptcy judge held that TFI's secured claims or administrative claims should be subordinated to a position equal to, and not below, that of general unsecured creditors and TFI's liens upon Fabricators' property should be transferred to the estate pursuant to Section 510(c)(2) of the Bankruptcy Code. 109 B.R. 186. Both parties appeal the order. TFI contests the bankruptcy court's finding that its claims should be subordinated at all. Fabricators suggests error in the subordination of only the liens on the debtor's property. After due consideration of the record and arguments of counsel, and being likewise advised in the premises, the Court finds as follows:

In its Memorandum Opinion and Order dated November 16, 1987, from which this appeal is taken, the bankruptcy court rendered lengthy and comprehensive findings of fact. Except for a few key points as will be noted *infra*, the parties to this action do not dispute these findings.

Prior to January 1985, debtor Fabricators was a Mississippi corporation engaged in the steel fabrication business, and its common stock was owned by Theodore J. Millette, Thomas S. Millette, William G. Millette, and James C. Avinger. TFI was engaged in the same type of business, and its sole stockholder, director, president, and chief executive officer was Marcus Wayne Williams. Prior to February 1985, TFI had no business connection with Fabricators.

The bankruptcy court then found that as of February 1, 1985, Fabricators had acquired several contracts for business but was experiencing difficulty with performance and completion. The problems in part were due to Fabricators' lack of cash, insufficient physical capacity and equipment, and inefficient management capability. Fabricators' financial condition deteriorated to the point that by January 1985, the company could not pay its $40,000 weekly payroll.

In late 1984, the first contacts between Fabricators and TFI occurred. Avinger, president of Fabricators, inquired into a possible merger, joint venture, or outright sale of Fabricators to TFI. Soon thereafter, negotiations were undertaken. The parties involved were Williams for TFI and Avinger, Tom Millette, William Millette, and Ted Millette for Fabricators. The bankruptcy court then found that Fabricators' financial problem was referred to as a "cash crunch" during these negotiations. The court also stated that Avinger provided Williams a handwritten cash flow projection that indicated a profit margin of $2,000,000 on Fabricators' pending contracts.

Significantly, the bankruptcy court made very specific findings as to the financial condition of Fabricators prior to February 1985, and exactly what Williams knew of it. The court found as follows:

Williams was advised by Avinger and the Millettes that Fabricators' credit lines were "jammed"; that bank credit was exhausted; that Fabricators could not meet its payroll and payroll tax obligations; and that Fabricators' plant was inadequate for the timely performance of the contracts in process.

Williams was also told that the accounting records of Fabricators had not been posted currently, but that when financial statements were prepared, they would show Fabricators as having a positive net worth as of November 30, 1984, and would reflect that Fabricators had a net profit from operations for the months of December 1984, and January 1985, of at least $100,000.00; that the value of the equipment and inventory owned by Fabricators was approximately $3.5 million; and that the sum of $173,000.00 would pay all existing trade payables exclusive of any amounts owed to companies owned by the shareholders.

No current Fabricators financial statements were available to either Fabricators or TFI because of problems resulting from the computerization of Fabricators' books. Williams was not shown, and *did not request*, Fabricators' last federal income tax return. Fabricators' last federal income tax return was for the period ending November 30, 1983, and reflected a loss of $612,000 and retained earnings of <$1,085,949>. For at least two years pre-petition, Fabricators had lost substantial money from its operations. [Emphasis original].

A writing was signed on February 2, 1985, which memorialized an agreement entered into by Williams and the shareholders of Fabricators. The parties agreed that TFI would purchase all of the shares of Fabricators, and the Fabricators shareholders would receive twenty-five percent (25%) of the shares of TFI. TFI's obligation to close the sale was conditioned on its review of the books and records of Fabricators and its satisfaction with Fabricators' financial status. The closing date was set as 45 days after February 2, 1985. The bankruptcy court then stated that incident to

the stock exchange agreement, TFI agreed to lend Fabricators up to $500,000. It was further agreed that Williams would assume control of Fabricators. Then, on February 4, 1985, Fabricators gave TFI a security interest in, *inter alia*, its machinery, equipment, accounts receivable, and contracts in progress. Thereafter, TFI advanced Fabricators $40,000 on February 4, 1985, $10,000 on February 5, 1985, and $44,000 prior to February 10, 1985.

On February 10, 1985, Williams and the original stockholders of Fabricators signed an agreement reflecting a renegotiation of the February 2nd agreement. The parties eliminated TFI's right of refusal after examining Fabricators' financial condition. The parties set a new closing date of 45 days from the execution of the February 10th agreement. Also on February 10, 1985, Williams was elected Executive Vice-president. The bankruptcy court found that he had not been an officer of Fabricators prior to that date, but he did exercise control over the debtor.

After February 10, 1985, Williams exercised dominion over Fabricators. He devoted much of his time toward its management. He also held himself out as chief executive officer of Fabricators. Between February 11, 1985, and March 9, 1985, Fabricators operated in TFI's physical facilities in Mobile, Alabama, and in its own place of business in Pascagoula, Mississippi. Williams remained in charge of operations, and TFI advanced Fabricators an additional $135,000 on February 18, 1985, and $40,000 on February 22, 1985.

The bankruptcy court then found that as early as February 2, 1985, Williams was given access to Fabricators' books. He began an attempt to secure "asset-based" financing by preparing the financial information needed. Williams learned of an ongoing IRS audit, and by February 19, 1985, he decided Fabricators would probably not be able to secure asset-based lending. Particularly, Williams had negotiated with Chase–Manhatten Bank [Chase] who performed its own audit. Chase advised Fabricators that it was denying the asset-based loan on February 27, 1985.

On March 7, 1985, Boutwell and Company, Fabricators' accountants, provided Williams with preliminary drafts of their audit reports. They reflected that Fabricators had lost some $1.2 million through November 1984 and $169,000 for December 1984 and January 1985.

On March 9, 1985, Williams held a meeting attended by Avinger, the Millettes, and Dan McMullan, a Certified Public Accountant with Boutwell and Company. Williams stated that he did not intend to consummate the stock purchase because of Fabricators' financial condition. However, Williams did not demand that Fabricators vacate the TFI facilities, and he continued, until March 24, 1985, to manage Fabricators' affairs. On March 14, 1985, TFI further advanced $100,000 to Fabricators.

On or about March 19, 1985, well past the announcement of March 9, 1985, Williams opened a bank account at the First National Bank of Mobile for Fabricators by representing he was chief executive officer in a corporate resolution authorizing the account. However, no such corporate resolution had been adopted. The account was opened for the purpose of, as the bankruptcy court found, depositing contract proceeds beyond the reach of Mississippi creditors.

Throughout Williams' tenure as managing agent of Fabricators, he made several representations to Fabricators' creditors. Greer and Sons, Inc., decided to continue an open account with Fabricators due to Williams' assurances that the money would come in "like clockwork." Jeffreys Steel Company, which had in 1984 declined new credit for Fabricators, extended a new line based on Williams declaration that he was chief executive officer and had controlling interest. Jeffreys advanced $60,464.94. In early 1985, Central Marine Services of New Orleans contacted Williams regarding its outstanding debt. Williams told Central Marine that he was Fabricators' chief executive officer, and his approval was necessary on all checks. Central Marine was paid after February 10, 1985.

On March 24, 1985, Williams' association with Fabricators came to an end when all

the parties entered into a release agreement. The agreement cancelled TFI's acquisition of Fabricators and provided for the repayment of $394,000 advanced by TFI. The agreement further called for an execution of a promissory note. Thereafter, Williams had no further management relationship with Fabricators.

The bankruptcy court then made the following findings:

During the first week of April, 1985, TFI threatened to prevent shipment of steel fabricated for the Nicholson contract at TFI's Mobile facility unless Fabricators agreed to pay the proceeds of the contract to TFI. TFI wanted to use those proceeds to obtain TFI's release from certain trade debts to O'Neal Steel Corporation. TFI's threats to the Nicholson contract and other work still in TFI's facility precipitated Fabricators' Chapter 11 filing on April 8, 1985.

TFI was forced into an involuntary Chapter 7 proceeding in the Southern District of Alabama by order dated July 15, 1986. The action was due in part because Fabricators had utilized TFI's credit lines with various suppliers during Fabricators' occupation of TFI's Mobile facilities. Those unpaid creditors then petitioned for the involuntary proceedings.

TFI filed three proofs of claim and request for administrative expense in the instant case. Claim Number 7 was for $369,-000 plus interest and costs. Claim Number 6 was for $150,000—$200,000 based on Fabricators' use of TFI's credit lines. Claim Number 56 was for an unsecured claim for $75,000. TFI also seeks administrative expenses in the amount of $218,335.

## I. *Standard of Review*

Since this case comes to this Court by virtue of an appeal from the bankruptcy court judgment, the findings of fact of the bankruptcy judge are to be accepted by this Court unless they are clearly erroneous. Bankruptcy Rule 8013; *In re Multiponics, Inc.*, 622 F.2d 709, 713 (5th Cir. 1980); *Matter of Missionary Baptist Foundation*, 818 F.2d 1135, 1142 (5th Cir. 1987). [Matter of Missionary Baptist Foundation II]. On the other hand, the bankruptcy court's conclusions of law are freely reviewable on appeal.

A finding of fact is clearly erroneous "when although there is evidence to support it, the reviewing Court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Matter of Missionary Baptist Foundation of America*, 818 F.2d at 1142. "When a finding of fact is premised on an improper legal standard, or a proper one improperly applied, that finding loses the insulation of the clearly erroneous rule." *Id.*

## II. *Equitable Subordination*

This matter originally arose as an action for equitable subordination in a bankruptcy procedure. It is well established that a bankruptcy court has the authority to subordinate a claim on equitable grounds. *See, Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *Multiponics, supra; In re Mobile Steel Company*, 563 F.2d 692 (5th Cir.1977); *Matter of Missionary Baptist Foundation II, supra.* The right of the bankruptcy court to order equitable subordination of claims has been codified in 11 U.S.C. Section 510(c) which provides:

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

The legislative history of Section 510 reveals that Congress intended for the court to follow existing case law in deciding which claims are to be subordinated and to continue to develop the principles of the doctrine of equitable subordination on a case-by-case basis. 124 Cong.Rec. H 11095 (Sept. 28, 1978). Earlier decisions of the

Fifth Circuit, therefore, have *stare decisis* value.

The leading case in the Fifth Circuit regarding equitable subordination is *In re Mobile Steel Company, supra.* There, the court established a three prong test for determining the applicability of the doctrine. The Court stated that:

1. The claimant must have engaged in some type of inequitable conduct.

2. The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.

3. Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act.

*Mobile Steel,* 563 F.2d at 700.

In the instant case, the bankruptcy court applied the *Mobile Steel* test and found equitable subordination appropriate. The court initially explored TFI's relationship to Fabricators and found that TFI was an insider as of February 2, 1985. Accordingly, the court more rigorously scrutinized TFI's conduct and found that it had indeed engaged in inequitable conduct in light of Fabricators' undercapitalized condition. TFI's advances were then treated as capital contributions. Next, the court found that the misconduct injured the creditors of Fabricators and that the subordination would not be inconsistent with the Bankruptcy Code.

TFI now presents numerous arguments for reversal of the bankruptcy court's decision. Each will be addressed in turn.

### III. *Wages v. Weiner*

█ TFI vigorously argues to this Court that the bankruptcy court failed to apply the holding of *Wages v. Weiner,* 381 F.2d 667 (5th Cir.1967) to the facts before it. In *Wages,* the debtor corporation was originally solely owned by Thomas A. Bennett. In order to induce D.L. Wages to advance $60,000, Bennett transferred 70 shares outright to Wages, 5 shares to escrow and 75 shares to Wages as security, totaling all the outstanding capital stock. Bennett remained president of the corporation. Wages became a director and "paid consid-erable attention to the business of the corporation...." Wages spoke of himself as a "partner" of Bennett, and the advance was made after a fire which the bankruptcy court found to have left the operation short of capital. *Wages,* 381 F.2d at 668. The corporation filed bankruptcy nine months after the advance.

The bankruptcy court concluded that the monetary advancement was a contribution of capital to the corporation rather than a loan. The district court affirmed, but the Fifth Circuit reversed the district court. The Court stated that such a determination was wholly without evidence and thus clearly erroneous. *Id.* at 668–69.

In the instant case, the bankruptcy court failed to address *Wages,* and TFI argues that reversal is necessary on that ground alone. However, this Court is not persuaded. It is well-recognized in this Circuit that bankruptcy cases, and, in particular, equitable subordination cases, are highly factual. Concerning cases of precedent, the Court has stated: "Beyond their specific circumstances, their reach is limited." *Multiponics,* 622 F.2d at 714. *See Mobile Steel, supra,* at 703–04.

While this Court cannot fail to see similarities between *Wages* and the instant case, several factual points differ significantly. First of all, Wages was considered to be an outsider, but, here, TFI was found to be an insider placing it in a more precarious position. Second, Wages showed only an interest in management, but, here, TFI through Williams became the management of the debtor. Williams held himself out as chief executive officer and transacted business for Fabricators on that basis. In addition, Williams had agreed to become the dominant stockholder in the debtor corporation. In *Wages,* the court recognized the difference that would make when it commented that Wages was neither a dominant stockholder nor a managing officer. Williams was. Additionally, the court found that Wages acted in good faith and benefitted the interest of the creditors. In the instant case, the court found detriment to the creditors.

Next, the motivations of the "lenders" in *Wages* and the instant case differ. *Wages* made the loan upon an "offer of a bonus" by the debtor corporation's stockholder. In the instant case, TFI's motive was the purchase of Fabricators so as to realize a projected $2,000,000 in profits.

Finally, although the *Wages* court found that the debtor corporation was "short on capital" at the time of the advance, it did not make a finding of undercapitalization. In the case *sub judice*, the bankruptcy court made the specific finding.

The *Wages* decision, then, is clearly factually distinguishable from the one at hand. Further, the bankruptcy court fully and adequately applied the superseding *Mobile Steel* case and its test for equitable subordination. For these reasons, this Court does not find error in the bankruptcy court's failure to address the *Wages* opinion.

## IV. *Inequitable Conduct*

As previously noted, the first prong of the *Mobile Steel* test is that the claimant engage in some type of inequitable conduct. From the facts before it, the bankruptcy court found TFI guilty of inequitable conduct in the following ways:

1. Making loans to Fabricators on a secured basis at a time at which the bankruptcy court determined that Fabricators was undercapitalized and at a time when TFI's motivation in advancing that money was to acquire control of Fabricators in order to realize a projected $2,000,000 profit on contracts in progress.

2. Causing creditors to extend new credit or to abstain from collection measures when TFI knew or should have known that Fabricators was in failing financial circumstances.

3. Interfering with the completion of Fabricators' contract with Nicholson Engineering Systems to gain preferential payment and a release from TFI's liability to O'Neal Steel Corporation.

4. Presenting a fraudulent resolution in order to open a bank account for deposit of Fabricators' receivables beyond the reach of creditors.

5. Obtaining a lien upon Fabricators' assets to secure capital contributions which shifted the risk of loss from TFI to the creditors of Fabricators.

■ The court's ruling on the issue of inequitable conduct was based in large part upon its finding that TFI was an insider. The determination is crucial because the conduct of a fiduciary is subject to special scrutiny by the court and implicates a higher degree of fidelity than the conduct of an unrelated third party. *Mobile Steel, supra.*

■ However, while the conduct of an insider is subject to rigorous scrutiny, it is not sufficient for the trustee merely to establish insider status in order to invoke equitable subordination. *Matter of Missionary Baptist Foundation II*, 818 F.2d at 1143. The trustee must prove inequitable or unfair conduct, injury to other creditors, and consistency with the bankruptcy code. *In re Medical Equities, Inc.*, 83 B.R. 954 (Bkrtcy.S.D.Ohio, 1987); *Matter of Missionary Baptist Foundation II, supra. In re N & D Properties, Inc.*, 799 F.2d 726 (11th Cir.1986). On the other hand, if the claimant is not an insider, the Trustee must prove more egregious conduct such as fraud, spoliation, or overreaching. *N & D Properties*, 799 F.2d at 731.

■ In the case at bar, the bankruptcy court looked to the definition of "insider" found at 11 U.S.C. Section 101(30) which provides:

(30) "insider" includes:
  (B) if the debtor is a corporation—
  (i) director of the debtor;
  (ii) officer of the debtor;
  (iii) person in control of the debtor;
  (iv) partnership in which the debtor is a general partner;
  (v) general partner of the debtor; or
  (vi) relative of a general partner, director, officer, or person in control of the debtor; ...

The court then found that TFI exercised control over the debtor as of February 2, 1985. Specifically, the court stated:

TFI and Fabricators became affiliates and insiders no later than February 2, 1985, by virtue of their written agreement for TFI to acquire all of the shares in Fabricators, and the two companies merging of their affairs shortly thereafter under Williams' direction and control. TFI and Fabricators constructively emerged their affairs following the February 2, 1985, stock exchange agreement.

TFI now argues that the court's findings of facts are clearly erroneous and its conclusions that TFI was an insider as of February 2, 1985, is an erroneous conclusion of law. The Fifth Circuit has stated that the determination of insider status is a question of fact. *Matter of Missionary Baptist Foundation,* 712 F.2d 206, 210 (5th Cir. 1983). [Matter of Missionary Baptist Foundation I]. Here, this Court does not find that the bankruptcy court's decision on this issue is clearly erroneous. There is no impression that a mistake has been made. The evidence reveals that TFI signed an agreement with Fabricators on February 2, 1985, to acquire all the stock in Fabricators and assumed a dominant interest. Therefore, TFI, the evidence shows, was the equitable owner of Fabricators from that day forward. Consequently, the advances made as early as February 4, 1985, should be given closer scrutiny.

■ The bankruptcy court then changed its focus to the nature of the conduct. The court recognized that a claimant's conduct can be characterized as inequitable if the claim arises out of one of the following three categories:

(1) fraud, illegality, breach of fiduciary duty;

(2) undercapitalization; or

(3) use of the debtor as a mere instrumentality or alter ego.

*Matter of Missionary Baptist Foundation I,* 712 F.2d at 212. The court then found that Fabricators was undercapitalized at the time of the advances, and TFI knew or should have known of its financial status.

Again, this Court fails to find error with this reasoning.

The bankruptcy court relied on the following Fifth Circuit definition of undercapitalization:

[W]e think that for the purposes of determining whether claims against the bankrupt estate held by organizers or shareholders should be subordinated on the ground of undercapitalization, the amount of capitalization that is adequate is:

what reasonable prudent men with a general background knowledge of the particular type of business and its hazards would determine was reasonable capitalization in the light of any special circumstances which existed at the time of incorporation of the now defunct enterprise.

N. Lattin, *The Law of Corporations* Sections 15, 77 (1971); *cf.* H. Ballentine, *Corporations* 302–03 (rev. ed. 1946) (disregard of corporate entity); *see generally* E. Latty, *Subsidiaries and Affiliated Corporations,* 119–28 & 133–38 (1936). This general definition is helpful because it focuses on the culpability of the organizer-stockholders and pegs the assessment to more specific standards which do not involve open-ended quantitative questions. Foremost among the standards which the general statement suggests are the following.

(1) Capitalization is inadequate if, in the opinion of a skilled financial analyst, it would definitely be insufficient to support a business of the size and nature of the bankrupt in light of the circumstances existing at the time the bankrupt was capitalized;

(2) Capitalization is inadequate if, at the time when the advances were made, the bankrupt could not have borrowed a similar amount of money from an informed outside source.

*See* Rembar, "Claims Against Affiliated Companies in Reorganization," 39 Colum. L.Rev. 907, 915–16 (1939).

*In re Mobile Steel Co.,* 563 F.2d at 703. *See also In re Multiponics, supra.*

The bankruptcy court in the action *sub judice* relied on the facts that as of the date of the first advances Fabricators could not have borrowed the same amount from an informed outside source. The court then stated that TFI was aware of Fabricators' "cash crunch," jammed credit lines, inability to obtain conventional loans, inability to meet its payroll, and an ongoing IRS audit. Therefore, the court concluded that the debtor was undercapitalized, and TFI knew of its condition when it advanced the money. This finding is not clearly erroneous.

TFI argues that policy considerations require reversal of the bankruptcy court on this issue. TFI relies upon its self-acclaimed position as an "outsider" which merely infused capital into a perceived salvageable organization. However, TFI's reliance on the "outsider" classification has previously been rejected.

■ TFI vigorously attacks the court's findings concerning Fabricators' financial condition at the time the money was advanced. However, this Court cannot fault the bankruptcy court's findings. The bankruptcy court specifically set forth its factual findings supporting its decision. The standard for determining whether a corporation is undercapitalized is an objective rather than subjective test. *In re Mobile Steel, supra.* The Fifth Circuit has stated that:

> The primary inquiry of this Court is to ask whether, under the circumstances, reasonably prudent men with general business backgrounds would deem the company undercapitalized.

*Multiponics,* 622 F.2d at 717. The bankruptcy court's findings then should not be overturned unless clearly erroneous. Here, there is substantial evidence that the debtor was undercapitalized, and TFI knew or should have known about it.

■ TFI's next attack on the opinion is that the fact a claim may be secured is of no consequence to the issue of subordination. However, the security given for the advancement was not the sole grounds for the bankruptcy decision. Rather, the court examined the effect of the security agreement on the creditors. Of course, as discussed *infra,* the effect of the inequitable conduct is a factor to be considered.

■ TFI also contests the bankruptcy court's findings regarding the transfer or future transfer of shares from Fabricators to TFI. In support of its argument TFI cites *In re Pacific Express, Inc.,* 69 B.R. 112 (9th Cir.1986). There, the court held that the lenders, 66 loan participants, *were not* insiders even though they each had accepted 1.357 shares for each dollar advanced to the debtor corporation. The court found that the acceptance of the stock and the transaction involved did not equate inequitable conduct. However, the court noted that the debtor's largest creditor was involved in the negotiations and conditionally agreed to defer collection of its claims. *Pacific Express,* 69 B.R. at 118.

The instant case is clearly distinguishable in two key respects. First, Williams has been found to be an insider, and second, none of Fabricators' creditors were involved in the attempted revitalization of the corporation. Rather, the evidence reveals that Williams attempted to become the owner, the investor, the manager, and savior all on his own through the auspices of TFI. Although TFI disagrees with it and denies it, the bankruptcy court's finding regarding Williams' and TFI's profiteering motives are supported by the record, and it is this motive in conjunction with all the factors involved that reduces TFI's conduct to a level considered inequitable. TFI now attempts to single out one aspect of its behavior to justify its action. This Court would agree with TFI if all it had done was lend money and take shares as had the lenders in *Pacific Express.* However, Williams and TFI were much more involved as the record reveals.

■ Next, TFI contends that the bankruptcy court was in error when it found that TFI acted inequitably when TFI induced creditors to extend new credit or to abstain from debt collection measures when TFI knew or should have known that Fabricators was in poor financial condition. TFI then reargues and reemphasizes par-

ticular aspects of the evidence before the Court. However, this Court's review is not judged by whether there was evidence supporting a contrary viewpoint, but rather whether the court's conclusions were clearly erroneous. This Court finds that they were not. The record is clear that the creditors opened new lines of credit or postponed collection procedures based on Williams' representations particularly concerning his managerial role with Fabricators.

TFI then makes the incredible argument that these creditors "knew or should have known, that Fabricators was experiencing financial trouble" since they had not been paid by Fabricators for several months. The contention is incredible in light of TFI's earlier position regarding its own knowledge of Fabricators' financial position. On the one hand, TFI argues that even though it was working to acquire stock in and control of Fabricators, it could not have known of Fabricators' financial position. However, it now seeks to thrust that knowledge upon mere creditors. The Court does not accept the argument.

■ TFI next objects to the bankruptcy court's finding that TFI acted inequitably when it interfered with the completion of Fabricators' contract with Nicholson Engineering Systems to gain preferential payment and a release from TFI's liability to O'Neal Steel Corporation. The bankruptcy court found:

> During the first week of April, 1985, TFI threatened to prevent shipment of steel fabricated for the Nicholson contract at TFI's Mobile facility unless Fabricators agreed to pay the proceeds of the contract to TFI. TFI wanted to use those proceeds to obtain TFI's release from certain trade debts to O'Neal Steel Corporation. TFI's threats to the Nicholson contract and other work still in TFI's facility precipitated Fabricators' Chapter 11 filing on April 8, 1985.

TFI then simply argues that the finding of fact is clearly erroneous, and the judge's conclusion of law was mistaken. There is testimony in the record and other evidentiary material which support the bankruptcy court's decision. Basically, the court made a call on credibility due to conflicting versions of the Nicholson/O'Neal incident, and this Court refuses to overturn that decision. Thomas Millette testified concerning TFI's position on the issue. Nicholson was to make a payment to Fabricators for part of a contract. In turn, TFI owed money to O'Neal Steel, a debt which Fabricators had allegedly incurred on TFI's line of credit. Millette testified concerning Williams involvement in the Nicholson/O'Neal Steel arrangement in the following dialogue:

Q. All right. And, what position was Mr. Williams taking with respect to that arrangement?

A. He didn't want the job to move.

Q. Why not?

A. Well, he ... he talked to us, on the side, of what the game plan may be. And, one of the game plans was, # 1, he wanted to be named as the payee on any checks that Nicholson was going to pay anybody. We couldn't allow that to happen, simply because we had to have that money ... we were already in bad enough financial shape, we didn't need any additional help, and it was bad enough that we were going to lose the labor that had been expended on this job up to that point, plus the fact, you know, Nicholson ... they were in trouble. So, if I'm not mistaken, you know, you were there that day and there was a lot of activity going around when all of this negotiating was going on; Nicholson was trying to get the thing worked out. And, Chandler Stanard [attorney for TFI] was involved in it and, you know, that Marcus Wayne or TECH/FAB be ... the checks be made payable to them or else they weren't going to let the job move; and, then there was a little side deal where Marcus Wayne said, you all have got to understand the game plan, you know. If ... if we can ... Nicholson has to have his job done, it's got to be completed here or somewhere else, and Nicholson is under the gun; and, hell, we could take the job right now and ... while Nicholson is over the barrel and the job is here, we could complete the job.

(Transcript, July 2, 1987, pp. 221–22). Millette then testified:

> And, one thing I do remember was Chandler Stanard came ... and this was the same day that the Bankruptcy was filed ... or that Chapter 11 was filed. And, Chandler came to me and he said, you know, we ... we're going to have to do something. First, he wanted me to call O'Neal Steel, I believe, and tell O'Neal Steel that Fabricators would be responsible for the steel bills that TECH/FAB had with O'Neal Steel. I wasn't going to do that ... I didn't have any authority to do that, I was one of the ones that were there, but I wasn't going to do that anyhow. And, then he threatened ... I can't remember, but I think he threatened to call O'Neal and have them put a lien on that Nicholson job, or whatever, but anyhow it ... whatever it was, he was going to stop the shipment of that job. And, he was going to call and force the issue and either have a lien put on it or he was going to do something that was going to monkey-up, or muddy-up, Nicholson being able to get that out of there and us being able to negotiate, as bad a taste as it was, the loss that we had ... that we sustained as a result of it.

(Transcript, July 2, 1987, p. 223). Finally, Millette concluded that it was this action on the Nicholson contract which forced Fabricators into Chapter 11. (Transcript, July 2, 1988, pp. 225–26). Consequently, this Court cannot find the bankruptcy court clearly erroneous in its findings of fact. Nor can this Court say that the bankruptcy court was mistaken when it found such threats constituted inequitable conduct.

■ The bankruptcy court then concluded that TFI acted inequitably by presenting a fraudulent resolution in order to open a bank account for the deposit of Fabricators' receivables beyond the reach of creditors. This conclusion was based upon the judge's finding of fact on page 10 that Williams caused a checking account to be opened at the First National Bank of Mobile on March 19, 1985, for the purpose of depositing contract proceeds beyond the reach of Mississippi bank creditors. The bankruptcy judge further found that this resolution was not authorized by the Board of Directors of Fabricators. This Court is not left with the impression that a mistake was made in this finding. An abundance of evidence confirms the validity of the bankruptcy court's finding.

## V. Injury to Creditors or Unfair Advantage to Claimant

■ As previously mentioned, the second prong of the *Mobile Steel* test is, "The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant." *Mobile Steel*, 563 F.2d at 700. The bankruptcy court found:

> The validation by this Court of TFI's lien would result in little or no distribution to the general creditors of Fabricators, and would, therefore, in light of the above findings, result in an injury to those creditors or unfair advantage for TFI.

Predictably, TFI contends that the bankruptcy court also erred in this finding. Specifically, TFI justifies its position in part by stating:

> In effect, the Bankruptcy Judge ruled that the second prong of the *Mobile Steel* test will be satisfied by a Trustee in Bankruptcy at any time that he proves that a creditor received a security interest in the bankrupt's assets as part of its consideration for lending monies to that debtor. If all that is required in order to prove injury to creditors is that the conduct of the debtor will result in little or no distribution to the general creditors, every creditor claiming a security interest will have its security interest transferred to the trustee because of inequitable conduct.

However, the Court is not convinced by TFI's contentions which presuppose the validity of any security agreements or liens. If the liens or security agreements were undertaken in good faith and without the tarnish of inequitable conduct, then said agreements would have to be upheld. The *Mobile Steel* factors are not separate entities. Rather, each must be satisfied. In

other words, there must first be misconduct. If not, then a valid security agreement stands whether or not it depletes the estate for other creditors.

In the instant case, the bankruptcy court clearly found inequitable conduct on the part of TFI. The result of the unfair mechanization was TFI's place of prominence over other creditors. If this Court were to overrule the bankruptcy court and legitimize the liens, TFI would, in fact, be unfairly advantaged in contrast to the remaining creditors. Since the third *Mobile Steel* factor is not at issue, the Court can only find that the bankruptcy court's decision regarding the equitable subordination of TFI's claims is not clearly erroneous factually or legally contrary to law. Consequently, it should be affirmed.

## VI. *Fabricators' Appeal*

■ Fabricators has appealed from the bankruptcy court's opinion only as it relates to the extent to which TFI's claims should be subordinated. Particularly, the bankruptcy court found that TFI's secured claims or administrative claims should be subordinated to a position equal to, and not below that of general unsecured creditors and TFI's liens on Fabricators' property should be transferred to the estate. Fabricators argues that the ruling grants corporate insiders equal status with creditors. As such, Fabricators contends, TFI will share equally in the assets of the estate with the very creditors it deceived.

The bankruptcy judge in determining the extent of the subordination relied upon *In re Missionary Baptist Foundation of America*, 818 F.2d 1135 (5th Cir.1987). There, the Court stated:

> [Claims] should be subordinated only to the extent necessary to offset the harm which the bankrupt and its creditors suffered on account of the inequitable conduct. *Id.* at 701. In illustration, we pointed out that "if a claimant guilty of misconduct asserts two claims, each worth $10,000, and the creditors amounted to $10,000, only one of his claims should be subordinated." *Id.* This is due to the fact that the exercise of the

principles and equitable relief is remedial, not penal.

*Matter of Missionary Baptist Foundation II*, 818 F.2d at 1143. Fabricators through its trustee cannot dispute that the aforementioned standard is a correct statement of the law. Rather, Fabricators attempts to attack the court's application of the law to the facts. However, this Court cannot fault the bankruptcy court's findings. The bankruptcy court took into account TFI's attempts to revitalize Fabricators during the merger effort. Therefore, this Court is unwilling to go beyond the determination of the lower court. For these reasons, the decision of the bankruptcy court should be affirmed in all respects.

### *Conclusions*

After a review of the record, the arguments of the litigants, and the bankruptcy court's findings, this Court finds that the bankruptcy court's opinion dated November 16, 1987, should be affirmed *in toto*. Consequently, the appeal and cross-appeal must both be denied.

An order in conformity with the foregoing Opinion shall be submitted by counsel for Fabricators within ten days of the date of entry hereof.