In re OCTAGON ROOFING,
d/b/a Western Modified
Roofing, Debtor.

BRAAS SYSTEMS, INC.,
Plaintiff–Appellant,

v.

WMR PARTNERS, Defendant–Appellee.

No. 92 C 4239.

United States District Court,
N.D. Illinois, E.D.

Aug. 17, 1993.

Cheryl Lynn Urbanski, Jones, Day, Reavis & Pogue, Chicago, IL, for plaintiff-appellant.

Howard L. Adelman, Brad Arnold Berish, Adelman, Gettleman & Merens, Ltd., Chicago, IL, for defendant-appellee.

## MEMORANDUM OPINION AND ORDER

ALESIA, District Judge.

On September 16, 1992, Braas Systems, plaintiff/appellant, filed an appeal to this Court challenging a bankruptcy court's judgment in favor of WMR Partners, defendant/appellee. On appeal here, Appellant argues (a) that a Subordination Agreement between the two is unambiguous and compels a result contrary to that reached below; and (b) that at the time of the WMR Partners' loan to Western, Western was undercapitalized and that the WMR Partners' claim should be treated as equity. For the reasons set forth in this Order, the judgment of the bankruptcy court in favor of WMR Partners is affirmed.

### I. STATEMENT OF FACTS

This appeal is taken from a judgment in a bankruptcy court action in which the plaintiff/appellant, Braas Systems, Inc. ("BSI"), sought equitable subordination and other relief against the defendant/appellee, WMR Partners ("WMR"). The adversary proceeding was conducted in Chapter 7 bankruptcy proceedings of Octagon Roofing, d/b/a Western Modified Roofing ("Octagon"). The judgment was rendered following eight days of hearings before the bankruptcy court. The Judgment Order was accompanied by separate Findings of Facts and Conclusions of Law (hereinafter cited as "F & C at ——, ¶ ——"), 141 B.R. 968.

In its early life, Octagon—a limited partnership—was a partner in Western Modified Roofing ("Western"), an Illinois partnership. Octagon's partner in Western was MSP Systems, Inc. ("MSP"). (F & C at 4, ¶ 9). Both Octagon and MSP were affiliates of larger companies active in the roofing industry. The general partner of Octagon, Hexagon Management Company

("Hexagon"), was owned by five individuals who also owned or controlled the ownership of American Roofing Corporation ("ARC") and American Roofing Systems ("ARS"). ARC and ARS were engaged in the manufacturing and distribution of Modified bitumen roofing material. (F & C at 4, ¶ 10).

MSP was the subsidiary of plaintiff/appellant BSI, which was, in turn, the subsidiary of a German corporation, Braas & Co. GmbH ("Braas"). Braas was also a manufacturer of roofing materials (though not modified bitumen) which were distributed in the United States by another BSI subsidiary, Barra Corporation of America, Inc. ("Barra"). (F & C at 5, ¶ 11).

In 1987, ARC/ARS and Braas, through Octagon and MSP, formed the partnership Western Modified Roofing for the purpose of manufacturing modified bitumen roofing material in the western United States. Ultimately, a site in Fernley, Nevada was chosen. The venture was initially capitalized through MSP's contribution of $500,000.00 cash and Octagon's contribution of know-how and technology related to construction, equipping and operation of a modified bitumen manufacturing plant. (F & C at 6–8, ¶¶ 14 & 16). In the course of the plant's construction, MSP loaned the venture another $500,000.00 in cash. (F & C at 11, ¶ 26).

During the first year and a half of their partnership, Braas and ARC/ARS suffered a number of disagreements. During the same period, Braas revised its business strategy to focus more heavily on opportunities in Europe and to reduce its presence in the United States. As a result, the parties negotiated an agreement ("the Termination Agreement") under which the partnership was terminated and Braas and MSP had no further involvement with Western. (F & C at 12–15, ¶¶ 27–32).

The Termination Agreement provided that MSP would assign its interest in Western to Octagon, including its interest in its $500,000.00 capital contribution and its interest in the later $500,000.00 loan to Western. In exchange, MSP was released from any further obligation to the partnership,

and its parent, BSI, was given a Term Note in the amount of $250,000.00. (F & C at 15, ¶ 32). This Term Note lies at the heart of this case.

The Term Note provided as follows:

The undersigned hereby grant BSI a security interest in all inventory, accounts receivable, machinery, equipment, buildings, fixtures and land now owned or hereafter acquired by Western Modified Roofing, *which security interest shall only be subordinated to the security interests granted to lenders of Western Modified* in connection with the construction, equipping, and operations at the plant owned by Western Modified Roofing near Reno, Nevada *and consistent with the lenders' normal advance rates.* The undersigned shall promptly execute and deliver any such mortgages, financing statements, or other instruments reasonably requested by BSI to perfect its security interest in the foregoing collateral. . . .

Defendant's Ex. 66 (emphasis added). The Term Note was signed by Eugene C. Scott as President of Hexagon, Octagon's general partner.

Octagon proceeded to open the plant and to operate it with financial support from ARC. By mid–1989, however, ARC was in financial trouble due to product problems and warranty claims, and Octagon needed cash. (F & C at 21, ¶ 43). After investigating the availability of outside financing, the ARC/ARS principals formed WMR Partners with a sixth individual who was a limited partner in Octagon. (F & C at 20, ¶ 42). These individuals contributed an aggregate $525,000.00 to WMR Partners and, on June 9, 1989 WMR Partners loaned that amount to Octagon and took a mortgage on the plant to secure repayment. (F & C at 17–18, ¶ 36). The deed of trust perfecting that mortgage was recorded shortly thereafter. The financial fortunes of the ARC/ARS group did not improve. The mortgage to BSI (the BSI Note) was never perfected.

Octagon was placed in bankruptcy on May 10, 1990. (F & C at 1, ¶ 1). BSI was

not scheduled as either a secured or unsecured creditor. (Tr. at 381–82). A Chapter 7 Trustee was appointed who sought to sell the Nevada Plant free and clear of liens pursuant to 11 U.S.C. § 363. (F & C at 2, ¶ 2). WMR Partners filed a motion for allowance of its claim and valuation of its security pursuant to 11 U.S.C. §§ 502 and 506. (F & C at 2, ¶ 3). Although not served with WMR Partners' motion, BSI did receive notice of the proposed Order granting that motion and appeared to assert its priority over WMR Partners in the proceeds of the sale. The bankruptcy court ordered that $275,000.00 of WMR Partners' claimed proceeds be escrowed pending a determination of BSI's claims. (F & C at 3, ¶ 6). This adversary proceeding followed.

BSI's Complaint against WMR Partners sought relief on four counts. After eight days of trial, the bankruptcy court announced its judgment for the defendant on all counts. Central to its decision was its conclusion that the subordination language of the Term Note, quoted in full *supra,* would have operated to subordinate BSI's security interest—even if perfected—to that of WMR Partners, rendering equitable subordination of WMR Partners' claim inappropriate. Further, the bankruptcy court concluded that no basis for subordinating the claim to the level of equity had been established. It is with these two conclusions that BSI takes issue and from which they appeal.

## II. *ANALYSIS*

### A. *Construction of Contract*

 In *Air Line Stewards & Stewardesses Ass'n, Local 550 v. American Airlines, Inc.,* 763 F.2d 875 (7th Cir.1985), *cert. denied,* 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986), the Seventh Circuit set forth the basic principles of Illinois law regarding the construction of contracts. There, the court noted that "[t]he primary object in construing a contract is to give effect to the intention of the parties." *Id.* at 877 (citing *Schek v. Chicago Transit Auth.,* 42 Ill.2d 362, 364, 247 N.E.2d 886, 888 (1969)). The starting point must be the contract itself. If the language of the contract unambiguously provides an answer to the question at hand, the inquiry is over. *Id.* at 878. The question of whether the contract is ambiguous is a conclusion of law subject to *de novo* review by the court on appeal. *Id.* (citing *National Tea Co. v. American Nat'l Bank & Trust Co.,* 100 Ill.App.3d 1046, 1049, 56 Ill.Dec. 474, 476, 427 N.E.2d 806, 808 (1981)). If the trial court determines that the contract is unambiguous, it must then proceed to declare its meaning. Such a declaration is also a conclusion of law and is reviewed *de novo. Id.* On the other hand, if the court holds that the contract is ambiguous, its meaning becomes a question of fact and must be submitted to the trier of fact. *Id.* (citing *Hagerty, Lockenvitz, Ginzkey & Assocs. v. Ginzkey,* 85 Ill.App.3d 640, 641, 40 Ill.Dec. 778, 779, 406 N.E.2d 1145, 1146 (1980)). In this circumstance, the trier of fact considers not only the language of the contract but also any extrinsic or parol evidence presented by the parties. Its determination is a finding of fact and this court must review that finding of fact under the clearly erroneous standard. *See Anderson v. Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985).

The issue here is whether the $525,000.00 loan from partners to Western was of a type, and from a source, to which BSI had agreed in the Term Note to subordinate its security interest. Analysis of the language of the subordination agreement indicates that it clearly was.

The first question is whether the contract is clear and unambiguous. The bankruptcy court found the terms of the BSI Note and the Subordination Provision "clear and unambiguous." (F & C at 15, 30). In fact, both parties agree with the bankruptcy court that the BSI Note and the Subordination Provision are clear and unambiguous. (Appellant's brief at 9; Appellee's brief at 30). Appellant argues, however, that the unambiguous words mean something other than what the Bankruptcy Court found.

■ Thus, the next question is the meaning of the unambiguous contract. *LaSalle Nat'l Bank v. Service Merchandise Co.*, 827 F.2d 74, 78 (7th Cir.1987). After determining that the terms of the BSI Note were clear and unambiguous, the bankruptcy court declared that the terms of the Subordination Provision clearly permit "the BSI Note to be subordinated to *any* lender's security interest so long as the loan is made ... within the range of the terms then offered by commercial lenders." (F & C at 30). This declaration by the bankruptcy court is a conclusion of law and is reviewed *de novo*.

■ The appellant agrees that the Subordination Provision is unambiguous, but argues that the word "lenders" in the Subordination Provision really means "institutional lenders only". (Appellant's brief at 9–12). The appellant, citing *Illinois Bell Telephone Co. v. Reuben H. Donnelley Corp.*, asserts that the court must look to the words used in the contract to determine the interest of the parties, and that absent ambiguity, the words of the contract are generally the sole indicators of what the parties intended. *Illinois Bell Telephone Co. v. Reuben H. Donnelley Corp.*, 595 F.Supp. 1192, 1197 (N.D.Ill.1984). Of course, when contract terms are clear and unambiguous, they must be given their ordinary and natural meaning, and no parol or extrinsic evidence may be considered to vary the meaning of the terms. *Susmano v. Associated Internists of Chicago, Ltd.*, 97 Ill.App.3d 215, 52 Ill.Dec. 670, 422 N.E.2d 879, 882 (1st Dist.1981).

Applying these principles to the BSI Note, this court agrees with the court below that the plain and ordinary meaning of the words "the lenders'" clearly permits the BSI Note to be subordinated to any lender's security interest and not merely to those of institutional lenders. This court, as did the bankruptcy court, refuses to read into the Subordination Provision the

word "institutional" where it was not inserted by the parties. Appellant's construction would require the word "lenders'" to mean "institutional lenders'." This would go against the principles pronounced in *Susmano v. Associated Internists of Chicago, Ltd.*, 97 Ill.App.3d 215, 52 Ill.Dec. 670, 422 N.E.2d 879, 882 (1st Dist. 1981) and *Illinois Bell Telephone Co. v. Reuben H. Donnelley Corp.*, 595 F.Supp. 1192, 1197 (N.D.Ill.1984). Such a construction does not accord with the plain meaning of the words, and therefore cannot prevail.

In the instant case, this court finds the intent of the parties in using the words "the lenders'" to be so clearly revealed from the contract itself, that evidence outside of the contract need not be considered. Since the language of the BSI Note unambiguously provides an answer to the question at hand, this inquiry is over and the finding of the Bankruptcy Court is affirmed.

## B. *Equitable Subordination*

The appellant next contends that the WMR Partners' loan should be treated as equity because Western was undercapitalized at the time the advance was made. The bankruptcy court found that Western was sufficiently capitalized and refused to apply the doctrine of equitable subordination to subordinate WMR Partners' loan to the BSI Note.

The judicially-created doctrine of equitable subordination developed as a policy against fraud and breach of the duties imposed on a fiduciary of the bankrupt.[1] *Pepper v. Litton*, 308 U.S. 295, 311, 60 S.Ct. 238, 247, 84 L.Ed. 281 (1939) (upholding use of equitable subordination as an equitable defense to the allowance of a claim in bankruptcy). This doctrine is now codified at 11 U.S.C. § 510(c):

---

1. The bankruptcy court has long been recognized as a court of equity. *See Local Loan Co. v. Hunt*, 292 U.S. 234, 240, 54 S.Ct. 695, 697, 78 L.Ed. 1230 (1934). Its equitable powers allow a bankruptcy court to produce fair and just results "to the end that fraud will not prevail, that

substance will not give way to form, that technical considerations will not prevent substantial justice from being done." *Pepper v. Litton*, 308 U.S. 295, 305, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939).

Notwithstanding subsections (a) and (b) ..., after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

█ Despite the laudable intention of the doctrine, however, equitable subordination is an unusual remedy which should be applied only in limited circumstances. *In re CTS Truss, Inc.*, 868 F.2d 146, 148–49 (5th Cir.1989). The concept of equitable subordination, as developed by case law, is that a claim may normally be subordinated only if its holder is guilty of misconduct. S.Rep.No. 989, 95th Cong., 2d Sess. 74 (1978). Moreover, the doctrine is remedial, not penal, and should be applied only to the extent necessary to offset the specific harm that the creditors suffered on account of the inequitable conduct. *In re Westgate–California Corp.*, 642 F.2d 1174, 1178 (9th Cir.1981); *In re Mobile Steel Co.*, 563 F.2d 692, 701 (5th Cir.1977).

█ In *Mobile Steel Co.* the Court of Appeals for the Fifth Circuit proposed three conditions, arrived at through a distillation of case law, that must be satisfied before exercise of the power of equitable subordination is appropriate: (1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage to the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code. *In re Mobile Steel Co.*, 563 F.2d at 700. This three-prong standard has been widely adopted by courts as the proper approach to follow in equitable subordination cases under 11 U.S.C. § 510(c). *See e.g., Koch Refining v. Farmers Union Central Exchange, Inc.*, 831 F.2d 1339, 1351 n. 13 (7th Cir.1987) (noting that the test has been adopted by many courts as

the standard formulation), *cert. denied,* 485 U.S. 906, 108 S.Ct. 1077, 99 L.Ed.2d 237 (1988); *In re UNR Industries, Inc.*, 46 B.R. 25, 27–28 (Bankr.N.D.Ill.1984). Furthermore, satisfaction of the three-prong test does not mean that a court is *required* to equitably subordinate a claim, but merely means that a court is *permitted* to take such action. *In re Fabricators, Inc.*, 926 F.2d 1458, 1464–65 (5th Cir.1991).

█ In any case, the court will not equitably subordinate the WMR Partners' loan because appellants have not met the requirements set out in *Mobile Steel.* In order to satisfy the first prong of the *Mobile Steel* standard appellant, BSI, must come forward with material evidence of inequitable conduct on the part of appellee, WMR Partners. To this end, BSI argues that Western was undercapitalized at the time WMR Partners lent the money to Western. The court below found that Western was not undercapitalized at the time of the WMR Partners' loan. F & C at 37. The inquiry into whether an entity is undercapitalized is a factual determination for which the case law has always applied the "clearly erroneous" standard of review. *See Barrett v. Continental Illinois National Bank & Trust Co.*, 882 F.2d 1, 4 (1st Cir.1989), *cert. denied,* 494 U.S. 1028, 110 S.Ct. 1476, 108 L.Ed.2d 613 (1990); *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056, 1063 (3d Cir.1992); *In re Multiponics, Inc.*, 622 F.2d 709, 717 (5th Cir.1980).

█ The concept of undercapitalization normally refers to the insufficiency of the capital contributions made to a corporation. When an insider makes a loan to an undercapitalized corporation, a court may recast the loans as contributions to capital. *See e.g., Spach v. Bryant*, 309 F.2d 886, 888 (5th Cir.1962). The ability to recharacterize a purported loan emanates from the bankruptcy court's power to ignore the form of a transaction and give effect to its substance. *See In re Global Western Development Corp.*, 759 F.2d 724, 727 (9th Cir.1985).

 More importantly, however, the courts have been consistent in holding that undercapitalization alone is an insufficient reason to apply equitable subordination. Evidence of other inequitable conduct is necessary to justify subordination. *See, e.g., In re Omega Lithographers, Inc.,* 17 B.R. 753, 754 (Bankr.M.D.Pa.1982); *In re Rego Crescent Corp.,* 9 Bankr.Ct.Dec. (CCR) 867, 23 B.R. 958, 964 (Bankr. E.D.N.Y.1982); *In re Branding Iron Steak House,* 536 F.2d 299, 302 (9th Cir. 1976). "[I]t is only when undercapitalization is combined with inequitable conduct, such as fraud, spoilation, mismanagement or faithless stewardship, that the claims of dominant or controlling shareholders and other insiders will be subordinated." *In re N & D Properties, Inc.,* 54 B.R. 590, 601 (Bankr.N.D.Ga.1985), *affirmed in part, reversed in part on other grounds,* 799 F.2d 726 (11th Cir.1986). Any other analysis would discourage loans from insiders to companies facing financial difficulty and that would be unfortunate because it is the shareholders who are most likely to have the motivation to salvage a floundering company. *Id.; see also In re Lemco Gypsum, Inc.,* 911 F.2d 1553, 1557 (11th Cir. 1990).

Appellant has not met its burden of demonstrating that Western or WMR Partners engaged in any inequitable conduct. Appellant directs the court to no evidence of any fraudulent or inequitable conduct on the part of WMR Partners. Furthermore, we cannot find that the bankruptcy court's factual findings are clearly erroneous. After reviewing the record on appeal, this court is convinced that the bankruptcy court correctly ruled that the evidence is insufficient to support the conclusion that WMR Partners engaged in fraudulent or inequitable conduct. There is also insufficient evidence to find that Western was undercapitalized at the time of the WMR Partners' loan. As such, appellant's undercapitalization argument fails.

 Lastly, the cases are clear that the mere fact of an insider relationship is insufficient to warrant subordination. *In re Missionary Baptist Foundation, Inc.,* 712 F.2d 206, 211–12 (5th Cir.1983). The insider status goes to establishing the standard to apply in reviewing the insider's conduct. In order to equitably subordinate a creditor's claim, the creditor-insider must actually use its power to control to its own advantage or to the other creditors' detriment. *See Comstock v. Group of Institutional Investors,* 335 U.S. 211, 228–29, 68 S.Ct. 1454, 1463, 92 L.Ed. 1911 (1948). Appellant has failed to prove any such inequitable conduct by the WMR Partners. The bankruptcy court properly applied the above referenced authority and held that since appellant had failed to show any inequitable conduct, the complaint fails. The bankruptcy court's decision is correct regardless of whether the Debtor was undercapitalized or not. Therefore, this Court need not review whether the Debtor was undercapitalized or not, since undercapitalization alone is not enough to warrant subordination of the WMR Partners' loan.

### III. *CONCLUSION*

For the reasons set forth above, the appellant's appeal is denied and the bankruptcy court's judgment in favor of the appellee is affirmed.