**In re LIFSCHULTZ FAST FREIGHT CORP., d/b/a Lifschultz Corp., Debtor.**

**Bruce de'MEDICI, not individually but as Trustee for Lifschultz Fast Freight Corp., d/b/a Lifschultz Corp., Plaintiff,**

v.

**SALSON EXPRESS CO., INC., Defendant.**

**Bankruptcy No. 90 B 21673. Adv. No. 92 A 01586.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

May 2, 1995.

Anthony V. Ponzio, Chicago, IL, for Salson Express.

Bruce E. de'Medici, Alan L. Fulkerson, Michael J. Coleman, Riordan, Larson, Bruckert & Moore, Chicago, IL, for Trustee for Estate.

## MEMORANDUM OPINION

RONALD BARLIANT, Bankruptcy Judge.

### I. INTRODUCTION

The Trustee seeks to equitably subordinate Salson Express Co., Inc.'s ("Salson") $300,000 secured claim and to transfer Salson's lien to the estate. The Trustee alleges that: 1) Salson is an insider of the Debtor and was used by principals of one or both corporations as a conduit to infuse capital into the Debtor disguised as secured loans by Salson; 2) the Debtor was insufficiently capitalized from its inception; 3) this conduct transferred all risk of loss from the equity holders to the unsecured creditors; and 4) Salson and its principals engaged in other inequitable conduct. The Court finds that the Debtor was not undercapitalized and that Salson and the equity holders did not engage in inequitable conduct. Therefore, the Trustee's request to equitably subordinate Salson's claim is denied.

### II. JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 1334. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(B).

### III. FACTS

1. *Events Leading Up To the New Lifschultz (Debtor).*

Until 1985, Lifschultz Fast Freight, Inc. ("LFFI") operated as a freight forwarder, consolidating freight and arranging for third party motor freight carriers to transport it. In 1985, David Lifschultz, president of LFFI, obtained authority from the ICC to operate as a motor freight carrier. A motor freight carrier transports freight consolidated by a freight forwarder. A carrier usually owns most of the over-the-road equipment it uses and directly employs the operators and load-

ers. Despite authorization to act as a carrier, however, LFFI continued to operate as a forwarder, arranging for third party motor freight carriers to transport cartage from one location to another.

Between 1985 and 1989, LFFI suffered significant financial losses [1] due in part to the expense of prosecuting an antitrust litigation and its refusal to discount rates.[2] In December 1989, LFFI decided to cut expenses and sell its operating transport business. At that time, LFFI's assets consisted of approximately $1.5 million in cash, the operating portion of the transportation business, real estate,[3] and an antitrust suit. The operating portion of the business was valued by David Lifschultz at approximately $2,000,000. LFFI was financed in part through a factoring agreement with Ambassador Factors ("Ambassador") and had paid virtually all its trade debt as it became due.

2. *The Agreement Between LFFI and the Debtor.*

David Lifschultz and LFFI decided to sell the operating portion of the firm as a going concern, rather than liquidate its component parts, in part to save the jobs of the employees. In early March 1990, Theodore Cohen and Anthony Berritto incorporated Lifschultz Fast Freight Corp., the Debtor, with an initial investment of $1,000. On March 12, 1990, the Debtor and LFFI entered into an agreement that provided for the Debtor's acquisition of the entire cartage operation of LFFI, including LFFI's non-New York based customer list, bargain real estate leases, and season tickets to sporting events. The only liability the Debtor assumed was approximately $232,000 of unpaid employee vacation. Excluded in the purchase were cash on hand/deposit, accounts receivable as of the closing date, certain real estate and LFFI's other liabilities. In return, LFFI received 20% of the stock in the Debtor.

---

1. LFFI's losses were as follows: (1) $399,000 in 1985; (2) $734,000 in 1986; (3) $2,043,000 in 1987; (4) $2,824,000 in 1988; and (5) $5,496,000 in 1989.

2. David Millner testified that LFFI's losses were due in part to the fact that the 1980's represented a "crazy time in the surface transportation industry" resulting from the ICC and Reagan Adminis-

tration's liberalization of the industry, which allowed free entry and encouraged discounting to win freight contracts. LFFI provided a high level and quality of service at a high cost to LFFI that its customers had grown to expect, and it refused to discount.

3. LFFI is receiving approximately $460,000 annually in sublet rent of these properties.

The directors and officers of Debtor were Theodore Cohen, Anthony Berritto, Sebastian DeMarco, Michael DeMarco, and Sidney Lifschultz. Stock in the Debtor was owned in the following portions: Salvatore Berritto 25%; Sebastian DeMarco 25%; Anthony Berritto 10%; Michael DeMarco 10%; Theodore Cohen 10%; and LFFI 20%.

The customer list purchased by the Debtor has been valued differently by both parties. The Trustee argues that the value of the customer list should be zero based on expert testimony from the accountant ("Trustee's Expert") who assessed the financial condition of LFFI ("February 5, 1991 Report") as it was just prior to LFFI's decision to sell. The Trustee's Expert was unable to obtain a business plan and, because the Debtor had no net earnings, she could not apply a multiple to the net earnings to assess the value of the customer list. Further, the Trustee's Expert determined that because LFFI was unable to make a profit with a business based on this list of customers, the customer list's value would be no better in the hands of the Debtor.

Salson's expert witness testified that customer lists are usually valued at a percentage of gross revenue or gross profit, not net earnings. Those percentages generally range between 5% to 10% of a company's sales. Based on this multiple, David Lifschultz testified that the customer list had a value of approximately $1.35[4] million. Another witness[5] involved in unsuccessful sale negotiations between LFFI and another company testified that the customer list had a value between $900,000 and $1.5 million. He believed that his company would have had to pay at least $1.0 million for the list, which was attractive because LFFI's department and retail store customers, who re-

quired freight hauled from one city to another by the morning of the second business day, paid high rates without discounts.

### 3. *The Debtor's Operations.*

The Debtor was licensed as a motor freight carrier but, according to Theodore Cohen, operated 90% to 95% as a freight forwarder. Originally, the Debtor leased LFFI's ICC authority to operate as a freight carrier and filed an application for authority with the ICC. A freight carrier can transact business as a freight carrier or freight forwarder, but a freight forwarder can only operate as a forwarder unless it has additional ICC authority to act as a motor freight carrier.

The Debtor owned between one to ten trucks, tractors and trailers from March 12, 1990 until the filing of the bankruptcy petition on November 20, 1990 ("Petition Date"). The vehicles were non-operational and were used primarily for storage. All of the Debtor's rolling stock was rented. Both David Lifschultz and Theodore Cohen testified that the capital investment required for a freight carrier is significantly greater than that of a forwarder.[6]

The Debtor intended to make LFFI's operation profitable by filling trucks leaving from the West Coast to their maximum capacity, even if that meant picking up freight from San Francisco and Los Angeles and delivering it to as many destinations on the East Coast as were required. The Debtor intended to avoid having less than full trucks delivering freight, which would enable it to negotiate better prices with freight carriers. The Debtor acquired the employees and drivers of SalSon/NJ,[7] the cartage agent of LFFI prior to March 12, 1990.

---

4. David Lifschultz reached this value after subtracting the value of the New York based customers, $150,000, that LFFI retained.

5. David Millner, who was involved in the failed negotiations between LFFI and Pacific Intermountain Express ("PIE"). The negotiations failed because LFFI was unwilling to sell only the customer list to PIE, which would have retained only certain key employees. LFFI chose to attempt to preserve the operation as a whole by selling to the debtor.

6. Mr. Cohen characterized a freight carrier's expenses as weekly for payroll and "pay as you go" expenses for tolls/gas/oil, maintenance of equipment and rolling stock. A freight forwarder has "as needed" expenses that can be controlled through subcontracting and the availability of credit terms ranging from 30 to 60 days.

7. An affiliated entity of Salson.

The Debtor's total weekly expenses were between $400,000–$500,000/week. The Debtor could not meet its first payroll and Sal-Son/NJ loaned $92,000 to LFFI, which paid the Debtor's first payroll. This loan was incorporated into the March 13, 1990 Loan Agreement between the Debtor and Salson (the "Salson Loan Agreement"). The claim at issue here is based on this agreement.

### 4. *Salson Loan Agreement.*

On March 13, 1990, Salson Express entered into the Salson Loan Agreement with the Debtor. Theodore Cohen prepared the agreement at the direction of Salvatore Berritto and Sebastian DeMarco. Pursuant to the agreement, the Debtor granted Salson a blanket security interest in the Debtor's assets. To determine terms for the loan, Cohen, representing the Debtor, spoke with Sidney and David Lifschultz about the terms of LFFI's loan agreement with Ambassador under which LFFI was paying interest at a rate equal to five points above the prime rate. Cohen also obtained information on the current terms of other factoring agreements at the time. Salson and the Debtor determined that the Debtor should pay Salson the same or a lesser rate than LFFI was paying Ambassador.

In order to finance the Debtor, the principals of Salson, as individuals, executed promissory notes in favor of First Fidelity and LFFI that were secured by their individual personal property. The principals then loaned the proceeds to Salson on a secured basis. The proceeds were deposited into a Salson account at First Fidelity[8] and Salson then loaned the proceeds to the Debtor under the Salson Loan Agreement. Salvatore Berritto, Anthony Berritto, Sebastian DeMarco and Theodore Cohen were authorized signatories on the Fidelity account. By April 10, 1990, $862,841.30 had been deposited into the Fidelity account from the following sources: (1) Salvatore Berritto and Sebastian DeMarco executed a $500,000 note in favor of LFFI, secured by their personal property

and deposited the proceeds; (2) Sebastain DeMarco deposited $155,092.10, $100,000 of which he borrowed from First Fidelity; (3) Salvatore Berritto deposited $105,092.10, $100,000 of which he borrowed from First Fidelity; (4) Central Express, a company owned by Salvatore Berritto and Sebastian DeMarco deposited $42,611.86; (5) Salson Trucking[9] deposited $40,045.24; and (6) Michael DeMarco deposited $20,000.

In March 1990, the Debtor opened general, payroll, and freight accounts at First Fidelity. Although the Debtor had its own accounts, all collections from its accounts receivable were deposited into LFFI's bank account until May 15, 1990, and all payments on the Debtor's indebtedness were made from LFFI's account. On May 14, 1990, the Debtor and Salson opened a new account at American National Bank of Chicago into which all proceeds of receivables were deposited. Salvatore and Anthony Berritto, Sebastian and Michael DeMarco and Theodore Cohen were the authorized signatories on that account. The name on the account was "Salson Express," until June 29, 1990, when it was changed to the Debtor's.

### 5. *Financial Deterioration of Debtor.*

In March, April and May of 1990, the Debtor lost $341,000, $157,000, and $164,000. During this time, Theodore Cohen's salary was increased from $75,000 annually to $125,000 annually of which $500 a month was deferred.[10] Michael DeMarco was given a salary of $1,400/week and Anthony Berritto was paid $5,000 and a salary of $600/week.

On August 9, 1990, Salvatore Berritto and Sebastian DeMarco were elected president and vice-president of the Debtor. On August 10, 1990, they executed and guaranteed a loan agreement between the Debtor and Ambassador Factors whereby Ambassador would loan the Debtor a maximum of $1,000,000. The debt under the Salson Loan Agree-

---

**8.** Proceeds from LFFI's accounts receivable were also deposited in this Salson account at First Fidelity.

**9.** An affiliated company of Salson.

**10.** Cohen testified that during his employ, he worked 70 to 100 hours a week and did not take a vacation.

ment[11] was subordinated to Ambassador's agreement. On August 10, 1990, $700,000 of the Ambassador loan was deposited into the Debtor's account at First Fidelity and the remaining $300,000 was remitted directly to LFFI in partial satisfaction of Berritto and DeMarco's $500,000 debt. From the Debtor's perspective, this represented a $300,000 payment on the balance due under the Salson Loan Agreement. On August 13, 1990, $150,000 of the $700,000 of proceeds in the general account at First Fidelity was transferred to the Salson Express Account at First Fidelity, representing a further reduction of the Salson Loan Balance. Salson used this $150,000 in proceeds to pay $100,000 directly to LFFI in further satisfaction of Berritto and DeMarco's indebtedness, and $50,000 to Salson Trucking.

Through the summer of 1990, the Debtor continued to experience losses and continued to increase officer salaries. The board of directors passed a resolution (1) raising Michael DeMarco and Anthony Berritto's salaries to $130,000/year and $55,000/year[12] respectively, and acknowledging a $20,500 liability owed to each of them for unpaid salary, and (2) increasing Cohen's salary to $130,000/year and acknowledging a $20,423.08 liability to him for unpaid salary.

On November 6, 1990, $100,000 was wired from American National account to the Salson Express Account at First Fidelity and used to make a $50,000 payment for each of Sebastian DeMarco and Salvatore Berritto's outstanding loan balances at First Fidelity. On November 13 and 19, 1990 an additional $100,000 was transferred from the American National account to the Salson account and used to pay off Berritto and DeMarco's obli-

gations to First Fidelity one day after the filing of the bankruptcy petition. The payments reduced the balance due under the Salson Loan Agreement to $300,000.

### 6. The Filing of the Involuntary Petition.

On November 20, 1990, an involuntary petition for relief under chapter 11 was filed. A few days later, Bruce de'Medici was appointed chapter 11 Trustee and operated the business until May 17, 1991 when the case was converted to a case under chapter 7. On January 3, 1991, Salson filed its proof of a secured claim for $300,000. Shortly thereafter, the Trustee brought this action. The Debtor's pre-petition unsecured debt was approximately $2,600,000.

The Creditor's Committee[13] hired Coopers & Lybrand ("Coopers") to assess the condition of Debtor. Coopers prepared the February 5, 1991 Report[14] concerning the operations, current cash position, and an assessment of the value of current cash flow.[15] After review of the Report, the Committee determined that the Debtor's operations should be terminated, which they were, and the Court, on the Trustee's motion, converted the case to a case under chapter 7.

In June of 1992, the Court approved the sale by the estate of its interest in the Dodgers tickets and a Commerce California long term commercial lease in exchange for the payment of $47,000 and $292,500 respectively. As of September 30, 1990, the Trustee had $318,508.96 in cash on deposit.[16] As of November 8, 1994, there are $632,000.00 in allowed administrative expenses.

11. Approximately $850,000.00.

12. The increase in salary was retroactive from the inception of the Debtor.

13. The U.S. Trustee appointed a committee of unsecured creditors pursuant to 11 U.S.C. § 1102(a).

14. The Defendant has filed a motion to reconsider the admission of Exhibit 46, the February 5, 1991 Report by Coopers and striking the the testimony of Nancy Ross concerning Exhibit 46. The argument is that the February 5, 1991 Re-

port does not address the Salson claim and is based on post-petition activities, testimony of which was barred by the Court's order granting the Plaintiff's motion in limine. That motion will be denied.

15. The Report was based on a review of the Debtor's profit and loss statements, cash receipts, accounts receivable, cash disbursements, expenditures, payroll, balance sheets and interviews with Noli Diaz, an employee of the Debtor, and Mr. Cohen.

16. Stipulated Fact.

7. *Evidence of the Adequacy or Inadequacy of Debtor's Capitalization.*

In June 1992, the Trustee retained Coopers to prepare a report on the Salson claim and the subordination issues. Coopers examined the Debtor's bank accounts, statements, the sale agreement with LFFI, the Salson claim, and the Ambassador Loan. Requiring additional information for its capital requirements analysis that could not be obtained from the Debtor, Coopers relied on the *TTS Blue Book of Trucking Companies, 1990–1991* ("*TTS Blue Book*") to determine the capital structure for the Debtor, based on a comparison of companies similar to Debtor with revenue between $5 million to $25 million. Coopers found the *TTS Blue Book* comparison to be valid because when it took the Debtor's administrative and general expenses between March 1, 1990 and October 31, 1990 extrapolated for twelve months, the total of $11.6 million was approximately equal to the *TTS Blue Book* companies to which it compared the Debtor's capital requirements. Based on this comparison, Coopers determined that Debtor's debt/equity capital ratio should have been 42% debt and 58% equity with a total capitalization of $3.7 million.

Assigning no value to the customer list or real estate and sport tickets, Coopers' opinion was that the Debtor was a turn-around company that had no short term expectation of net income. Taking the debt capital available to the Debtor as $850,000 to $1.5, the debt/equity ratios, according to Coopers, should have been $493,000 to $870,000 equity and $357,000 to $630,000 debt. Additionally, the total capitalization of the Debtor, $850,000 to $1.5 million is significantly less than $3.7 million capitalization of similar *TTS Blue Book* companies.

Coopers found two additional facts indicative of undercapitalization. First was Ambassador's requirement of a personal guarantee from the shareholders. Coopers analyzed this as Ambassador's insecurity about the equity cushion behind the loan. Second was the need for Salson to make the $850,000 loan. Coopers determined that this was necessary in order to borrow funds from a third party, Ambassador. Coopers' final determination was that the Debtor was initially capitalized with $1,000 and was undercapitalized from its inception.

Salson's Expert rebutted the Coopers evaluation on several grounds. First, Salson's Expert testified that comparing the Debtor to companies in the *TTS Blue Book* is misleading and inaccurate because the *TTS Blue Book* provides capital structures for carriers, not forwarders like the Debtor. Carriers necessarily require greater capital because they own the trucks and trailers, must meet weekly or bi-weekly payroll, pay for gas, tolls and oil, and maintain equipment and rolling stock necessary for the business. The carriers in the *TTS Blue Book* owned approximately 300 trucks, trailers and tractors while the Debtor owned no more than ten. Forwarders, however, only have "as needed" expenses that can be controlled through subcontracting and the availability of credit terms ranging from thirty to sixty days. The Trustee's Expert considered the Debtor a carrier instead of a forwarder. Additionally, Salson's Expert disagreed with the comparison of extrapolated general and administrative expenses and stated that any correlation was coincidence. Therefore, the capitalization requirements for the Debtor would be substantially less than those of a carrier such as those listed in the *TTS Blue Book.*

Second, Salson's Expert disagreed that the Debtor was capitalized with $1,000. Other assets should have been included in the calculation of capitalization: the customer list, valued at a minimum of $900,000, and the real estate and sporting tickets that were later sold by the Trustee for over $300,000. With these appropriate inclusions, the Debtor was adequately capitalized from its inception. Third, Coopers did not perform an analysis of pre-petition cash flow of the Debtor to determine what cash flow would be required of the company post-petition. Last, Salson's Expert disagreed with Coopers' characterization of Ambassador's guarantee requirement and testified that a lender often requires a guarantee in a closely held corporation because the distinction between the principals and the company is so vague that they are able to draw money in the form of salary and control the amount of equity in the company.

## IV. ANALYSIS

■ Undercapitalization is "often a bedfellow of other insider misconduct," *Machinery Rental, Inc. v. Herpel (In re Multiponics, Inc.)*, 622 F.2d 709, 716 (5th Cir.1980), *citing Herzog & Zweibel*, The Equitable Subordination of Claims in Bankruptcy, 15 Vand. L.Rev. 83, 94 (1961), and "the Court should make a factual determination as to whether the corporation has been provided with separate [capital] adequate to give it at least a reasonable business chance to carry out its asserted functions.... Capital in this context refers not to working capital, but to the amount of the stockholder's investment, the paid-in capital." *Id.* at 717 n. 8.[17] But, "undercapitalization alone is an insufficient reason to apply equitable subordination.... [I]t is only when undercapitalization is combined with inequitable conduct, such as fraud, spoilation, mismanagement or faithless stewardship, that the claims of dominant controlling shareholders and other insiders will be subordinated." *Braas Systems, Inc. v. WMR Partners (In re Octagon Roofing)*, 157 B.R. 852, 857–58 (N.D.Ill.1993). Therefore, even if the Court were to find that the Debtor was undercapitalized, the Trustee would have to demonstrate other inequitable conduct in order for this Court to exercise it equitable powers of subordination.

■ A bankruptcy court is a court of equity with powers to ensure fair and orderly administration of the estate. *Pepper v. Litton*, 308 U.S. 295, 303, 60 S.Ct. 238, 243, 84 L.Ed. 281 (1939); *Local Loan Co. v. Hunt*, 292 U.S. 234, 240, 54 S.Ct. 695, 697, 78 L.Ed. 1230 (1934). Equitable subordination is one such power that may be invoked to allow substance to prevail over form, and remedy a claimant's fraudulent and inequitable conduct by subordinating the claimant's claim to the "ethically superior claims asserted by other creditors." *Pepper v. Litton*, 308 U.S. at 303, 60 S.Ct. at 243; *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 697 (5th Cir.1977). However, "equitable subordination operates only to redress the amount of

actual harm done." *Estes v. N & D Properties, Inc.*, 799 F.2d 726, 732 (11th Cir.1986). Therefore, only the portion of the claim arising from the breach of fiduciary duty will be subordinated. *Id.*

■ The bankruptcy court's power of equitable subordination is codified in 11 U.S.C. § 510(c).[18] Section 510(c) provides that after notice and a hearing, the court may:

(1) under the principles of equitable subordination, subordinate for the purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

In order for a court to exercise the power of equitable subordination under § 510, three conditions must be satisfied: (1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the debtor or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Code. *Mobile Steel*, 563 F.2d at 699–700; *Octagon Roofing*, 157 B.R. at 857. The three factors must each be satisfied in turn before a court will examine the next prong. *Fabricators, Inc. v. Technical Fabricators, Inc.*, 126 B.R. 239, 250 (S.D.Miss.1989).

■ The dealings of an insider or fiduciary with the debtor are subject to a more rigorous level of scrutiny than the dealings of an outside third party. *Pepper v. Litton*, 308 U.S. at 305, 60 S.Ct. at 244; *Mobile Steel*, 563 F.2d at 701. When an insider's dealings with the debtor are challenged, the trustee must prove only the unfairness in the transaction. *N & D Properties, Inc.*, 799 F.2d 726, 731 (11th Cir.1986); *Matter of Fabricators, Inc.*, 926 F.2d 1458, 1465 (5th Cir.1991); *Fluharty v. Wood Products, Inc. (In re Daugherty Coal Company, Inc.)*, 144 B.R.

---

**17.** This is referred to as the "Deep Rock" doctrine enunciated by the Supreme Court in *Taylor v. Standard Gas & Electric Co.*, 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669 (1939).

**18.** Unless otherwise indicated, all statutory citations refer to the Bankruptcy Code (the "Code"), 11 U.S.C. §§ 101–1330.

320, 323 (N.D.W.Va.1992). "The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain." *Pepper v. Litton*, 308 U.S. at 306, 60 S.Ct. at 245.

The burden then shifts to the insider to prove both the good faith of the transaction as well as the transaction's inherent fairness to the corporation and other involved interests. *Pepper v. Litton*, 308 U.S. at 305, 60 S.Ct. at 244. However, the higher level of scrutiny was not intended to "discourage those most interested in a corporation from attempting to salvage it through an infusion of capital." *Mobile Steel*, 563 F.2d at 701.

The definition of "insider" is found in § 101(31). For a corporation, "insider" includes a director, officer, general partner or person in control of the debtor, a partnership in which the debtor is a general partner, or a relative of a director, officer, general partner or person in control of the debtor. 11 U.S.C. § 101(31); *Pepper v. Litton*, 308 U.S. at 305, 60 S.Ct. at 244; *Fabricators, Inc.*, 126 B.R. at 246. The parties have stipulated that Salson was an insider of the Debtor. Therefore, an application of the three pronged test will be made under heightened scrutiny. An examination of each element of the test demonstrates that the Trustee is not entitled to equitably subordinate Salson's claim.

▆▆▆ The first inquiry is whether the insiders engaged in inequitable conduct. Conduct can be characterized as inequitable if it arises out of one of the following categories: (1) fraud, illegality, breach of fiduciary duty; (2) undercapitalization; or (3) use of debtor as a mere instrumentality or alter ego.[19] *Fabricators, Inc.*, 126 B.R. at 247, citing, *Matter of Missionary Baptist Foundation*, 712 F.2d 206, 212 (5th Cir.1983); *Daugherty Coal*, 144 B.R. at 324. However, a showing of undercapitalization will still require additional evidence of other inequitable conduct. *Octagon Roofing*, 157 B.R. at 858. "Any other analysis would discourage loans from insiders to companies facing financial difficulty and that would be unfortunate because it is the shareholders who are most likely to have the motivation to salvage a

floundering company." *Id.; see also In re Lemco Gypsum, Inc.*, 911 F.2d 1553, 1557 (11th Cir.1990).

Generally, the amount of capitalization that is adequate is

> what reasonably prudent [people] with a general background knowledge of the particular type of business and its hazards would determine was reasonable capitalization in the light of any special circumstances which existed at the time of the incorporation of the now defunct enterprise.

*Mobile Steel*, 563 F.2d at 702; *Multiponics, Inc.*, 622 F.2d at 717. Specifically, undercapitalization can be established by proof of either of two conditions: (1) insufficient initial capitalization to make a business with the characteristics of the debtor a viable business; or (2) inadequate capitalization to obtain equivalent advances from an informed outside lender. *N & D Properties*, 799 F.2d at 733; *Mobile Steel*, 563 F.2d at 703; *Daugherty Coal*, 144 B.R. at 325.

When determining if either indicator of undercapitalization exists, the court is not bound by the actual characterization of the monetary advance as a loan. *Mobile Steel*, 563 F.2d at 702. "[S]o-called loans or advances by the dominant or controlling stockholder will be subordinated to claims of other creditors and thus treated in effect as capital contributions by the stockholder ... where the paid-in-capital is purely nominal, the capital necessary for the scope and magnitude of the operations of the company being furnished as a loan." *Pepper v. Litton*, 308 U.S. at 309–10, 60 S.Ct. at 246–47. Instead the court should determine "whether equity requires that they be regarded as if they were something else," such as a capital contribution. *Id.; In re Dan–Ver Enterprises, Inc.*, 86 B.R. 443, 450–51 (Bankr.W.D.Pa.1988). "Absolute measures of capital inadequacy, such as the amount of stockholder equity or other figures and ratios drawn from the cold pages of the corporation's balance sheets and financial statements, are of little utility, for the significance of this data depends in a

---

**19.** It should be noted that the inequitable conduct need not be directly related to the events

giving rise to the claim. *Mobile Steel*, 563 F.2d at 700; *Daugherty Coal*, 144 B.R. at 324.

large part upon the nature of the business and other circumstances." *Mobile Steel,* 563 F.2d at 702.

■ The Trustee argues that there are several factors proving the Debtor was undercapitalized. First, compared to other similar companies, the Debtor's debt/equity capital ratio was inadequate. Second, the Debtor required more than $1,000 of equity capital to operate a business with monthly expenses between $1,700,000 and $2,200,00. Third, both LFFI and Ambassador required personal guarantees on their loans to the Debtor. Fourth, Ambassador required subordination of the Salson loan.

The Court does not find that the Trustee has satisfied his burden of proving that either condition of undercapitalization existed at the inception of the Debtor. The Trustee's first argument in support of under-capitalization is not persuasive. Coopers relied on the *TTS Blue Book* which provides capital structures for freight carriers. This is clear from both Salson and the Trustee's own expert testimony. In fact, Coopers' analyst who performed the comparison calculations testified that she considered the Debtor a freight carrier when she performed the capital requirements analysis. The Debtor is a freight forwarder, not a freight carrier. The Court does not find that the coincidental similarity in general and administrative expenses of the Debtor and the *TTS Blue Book* companies justifies the unsuitable comparison of carriers to a forwarder. Although carriers and forwarders operate in conjunction, the nature of their businesses and expenses are different. Carriers and forwarders have different capital expenditures and cash flows, extend and receive different credit terms to customers and from suppliers. Forwarders are similar to brokers, arranging for freight to be consolidated, picked up by a carrier and then deconsolidated at the destination location. Forwarders usually do not have an interest in or responsibility for the vehicles used to carry the freight, vehicle maintenance, payment of gas, tolls, oil or salary to the drivers. These "pay as you go" expenses are characteristic of a carrier's business. Conversely, forwarders enjoy more flexible "as needed" expenses and cred-

it terms of thirty to sixty days. They have fewer fixed expenses and overhead than a carrier who must constantly maintain rolling stock and meet regular payroll for drivers and other employees not needed by a forwarder. Therefore, a comparison of the capitalization requirements and expenses of forwarders and carriers does not provide adequate evidence of under-capitalization.

The Court does not agree that the Debtor was initially capitalized with only $1,000. The Debtor began its operations with tickets and leases that were later sold by the Trustee for over $300,000 and a customer list, valued by the Debtor's experts at a minimum of $900,000. The only debt assumed by the Debtor in the purchase was $232,000 of unpaid employee vacation. The Trustee argues that because these assets generated five consecutive years of losses for LFFI, they would be insufficient to support the Debtor operating the same type of business. This is evidenced by the Debtor's need to borrow $90,000 to meet its first payroll. Based on this assumption, the Trustee argues that the value of these assets should be zero.

Several factors run contrary to the Trustee's assertion. First, purchasing a customer list is akin to purchasing a revenue stream without the overhead associated with developing that stream. Therefore, not only did the Debtor acquire an attractive list of department and retail store customers who were willing to pay higher rates, it acquired the list without the expenses of its development. Second, the Debtor did not acquire LFFI as a whole entity. The Debtor acquired only the tickets, leases, customer list, and employee vacation liability. All other liability, assets and business practices remained with LFFI. Although there was no formalized business plan, Salson provided testimony that the Debtor intended to make the operation profitable by filling trucks from the West Coast to their maximum capacity. Maximum capacity carriers had not been the general practice of LFFI. Third, the Debtor's inability to meet its first payroll evidences only a lack of liquidity. Had the Debtor chosen to sell all of its assets the day after the acquisition, it could have received $1,200,000 for the customer list, tickets and

leases. After satisfaction of the employee vacation liability, the Debtor could have had approximately $1,000,000.

The Trustee has not satisfied its burden of proving his third and fourth contentions that Ambassador and LFFI's requirement of personal guarantees from certain principals and Ambassador's requirement of a subordination agreement denotes undercapitalization or insecurity with equity capital. The Trustee did not present testimony from Ambassador or LFFI that they demanded personal guarantees or subordination agreements because they thought the Debtor was undercapitalized. The Trustee's expert witness testified only that under-capitalization is often a reason for a lender to require additional protection for its loan.

It is the nature of a lender's business to secure the best terms for its loan. Necessarily, this includes an evaluation of the individual risks of a particular borrower. A lender will require personal guarantees and subordination agreements where it determines additional protection is required. However, the indicators of additional protection are not limited to under-capitalization. A lender will often require additional protective measures when lending to a new company without a credit history. Additionally, in a transaction with a closely held company in which principals and shareholders are able to draw money and control the amount of equity, a lender may require guarantees.

The Trustee relies on *Multiponics*, 622 F.2d at 719–20 for the proposition that necessity of personal guarantees is strong evidence of undercapitalization. However, *Multiponics* dealt with egregious conduct committed by the directors of the debtor and direct evidence of the lender's concern of under-capitalization. That is not the situation before the Court. Without additional proof from the Trustee, the Court cannot find that undercapitalization was the reason for the guarantees and subordination agreement.

Having determined that the Debtor was adequately capitalized, the Court will examine the Trustee's additional allegations of misconduct on the part of Salson and the principals. The Trustee attempts to create an aura of misconduct with an extensive recitation of facts regarding the Debtor, LFFI and Salson's bank accounts at First Fidelity, which suggest co-mingling of funds and inappropriate deposits and withdrawals. However, the only specific allegation of misconduct that the Trustee makes is the transfer of $200,000 from the Debtor's account to Salson's account in order to repay Berritto and DeMarco's debts to First Fidelity. The Court does not find the Trustee's suggestive characterization of the handling of funds persuasive. The Debtor received a benefit when it transferred $200,000 from its account to Salson to repay Berritto and DeMarco's loans at First Fidelity. The Debtor owed that money to Salson, which, in turn, owed it to Salvatore Berritto and Sebastian DeMarco, who had made loans to Salson from the proceeds of their personal borrowings from First Fidelity in 1990. The Debtor's payment to First Fidelity reduced the Debtor's own outstanding obligation to Salson. An additional fact belying the Trustee's allegation of misconduct is the nature of the Salson loan to the Debtor. Salson's loan to the Debtor contained the same, if not better terms for the Debtor, as the Ambassador loan to LFFI. The principals had the opportunity to structure the loan to the Debtor, and chose the same bargain as the commercial lender, Ambassador.

■ The Trustee also focuses on the increases in salary to Theodore Cohen, Michael DeMarco and Anthony Berritto during the financial decline of the Debtor. Those raises do not constitute inequitable conduct for two reasons. First, although the increases may have been questionable business judgment, they do not rise to the level that courts have considered inequitable. An examination of prior cases demonstrates that severe breaches of fiduciary duty and misconduct are necessary in order to characterize conduct as inequitable. In *Fabricators, Inc.*, 126 B.R. 239, 248–49 (S.D.Miss.1989), the Court held that an inside creditor who interfered with the completion of the debtor's contract with another party by threatening to prevent shipment of necessary goods within the insider's control unless the debtor agreed to pay the proceeds of the contract over to the

357

insider was inequitable conduct. The same creditor was found to have acted inequitably by presenting a fraudulent board of directors' resolution in order to open a bank account for the deposit of the debtor's accounts receivable beyond the reach of creditors. In *Dan–Ver Enterprises, Inc.*, 86 B.R. at 451, a controlling officer's conduct was held inequitable where he (1) executed notes to all insiders, (2) directed counsel to prepare and execute Complaints in Confession of Judgment for the benefit of himself and other insiders, and (3) knowing that the debtor would be called upon to cure the default on a note it had guaranteed, directed the judgments be executed prior to the execution of the guarantee, in order to ensure a benefit to insiders. *See Multiponics*, 622 F.2d at 714–16 (director's conduct held inequitable when he authorized purchase of financially unstable company and knowingly made repeated violations of debenture agreement for personal gain). Questionable but unexceptional increases in salary during the financial decline of the Debtor do not rise to the level of misconduct suggested by these cases.

Second, even though the principals were authorized increases in their annual salary by the Debtor's board of directors, the increases were largely meaningless. On June 25, 1990, Cohen's salary increased from $75,000 annually to $125,000 annually, with $500 a week being deferred. Michael DeMarco and Anthony Berritto were authorized to receive $1400 a week and $500 a week. At the October 20, 1990 board meeting a $20,500 liability was acknowledged to each Theodore Cohen,[20] Michael DeMarco and Anthony Berritto accompanying additional increases in salary. When the liabilities are taken into account and the salaries adjusted to their accrual amount because the Debtor only survived eight months, the raises do not account for a significant amount. If the Debtor owed Cohen $20,423.08 in unpaid salary by October 20, 1990, Cohen would not have actually received more than $40,000 in salary.[21] Michael DeMarco and Anthony Berritto would not have received much more than $16,000[22] and $20,000[23] respectively. When examined in this light, the increases can not be characterized as the type of gross misconduct that court will characterize as inequitable.

The detriment to the unsecured creditors caused by Salson's claim can not justify equitable subordination, because the Court finds that there has been no showing of inequitable conduct. In order to subordinate a claim, "there must first be misconduct. If not, then a valid security agreement stands whether or not it depletes the estate for other creditors." *Fabricators Inc.*, 126 B.R. at 250. Although the validation of Salson's claim results in shifting the burden to the unsecured creditors, that injury does not result from inequitable conduct. Therefore, in the absence of inequitable conduct, the Court will not recharacterize Salson's secured claim as a capital contribution. Equitable subordination is inappropriate.

## V. CONCLUSION

The Trustee has not satisfied his burden in proving the inequitable conduct necessary to subordinate Salson's secured claim. Although the unsecured creditors must bear the burden of the bankruptcy, that burden was not due to misconduct of insiders of the Debtor. Therefore, in light of the foregoing conclusions, the Court denies the Trustee's

**20.** The exact liability acknowledged to Cohen was $20,423.08.

**21.** From March 12, 1990 to June 25, 1990 (sixteen weeks), Cohen received $1,500/week in salary which totals approximately $22,500. From June 25, 1990 to October 20, 1990 (seventeen weeks), Cohen received $2,500/week in salary which totals approximately $34,000. If the Debtor owed Cohen $20,428 in unpaid salary as of October 20, 1990, then as of that date, Cohen would have only received approximately $36,000.

**22.** Michael DeMarco received $1,400/week from April 23, 1990 through October 20, 1990 (twenty

six weeks) which totals approximately $36,400. If the Debtor owed DeMarco $20,500 in unpaid salary as of October 20, 1990, then DeMarco would have only received approximately $16,000 in salary.

**23.** Anthony Berritto received $1,067/week from March 12, 1990 through October 20, 1990 plus a $5,000 sum for service rendered. On October 20, 1990, the Debtor owed Berritto $20,500 in unpaid salary, and, therefore, Berritto would not have received more than $20,000 in actual paid salary.

**358**

request to equitably subordinate Salson's secured claim.

A separate order will be entered accordingly.

### ORDER

For the reasons stated in the Memorandum Opinion of even date, **IT IS HEREBY ORDERED THAT**

(1) the Trustee's request to equitably subordinate the secured claim of Salson Express Co., Inc. is **DENIED;** and

(2) Salson Express Co., Inc.'s motion to reconsider the admission of Exhibit 46 and to strike the testimony of Nancy Ross concerning Exhibit 46 is **DENIED.**